Robert A. MILLER, et al., Appellants,

v.

AIR LINE PILOTS ASSOCIATION,
Appellee.

No. 96–7033.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 16, 1997.

Decided March 14, 1997.

Raymond J. LaJeunesse, Jr., Springfield, VA, argued the cause for appellants, with whom Philip F. Hudock, Vienna, VA, was on the briefs.

Jerry D. Anker, Washington, DC, argued the cause for appellee, with whom Clay Warner, Herndon, VA, was on the brief.

Before SILBERMAN, WILLIAMS, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Nonunion pilots appeal the judgment of the district court, which largely relied on an arbitrator's award, as to the legality of the union's agency shop fees. We reverse.

## I.

Appellee Air Line Pilots Association (hereinafter ALPA or the union), is the exclusive collective bargaining representative of all pilots employed by Delta. In 1991, ALPA and Delta entered into an "agency shop" agreement under the Railway Labor Act (RLA), effective at the start of 1992, which requires all pilots who choose not to be members of ALPA to pay a "service charge" to ALPA "as a contribution for the administration of the [collective bargaining agreement] and the representation of [all] employees."

ALPA collected fees from appellants, 153 Delta pilots who have not joined the union (hereinafter the pilots), by following the procedures contained in its operating manual, Policies and Procedures Applicable to Agency Fees. The manual, in accordance with federal law, allows nonmembers to object to fees used for purposes not germane to collective bargaining. ALPA charged nonmem-

bers fees approximately 8% less than union dues from January 1 through June 30, 1992. That figure, which was an estimate, was based on 1990 outlays. But for the latter half of 1992, the union discounted the pilots' fees by about 17% because of newly available figures from 1991. ALPA sent each non-member pilot a copy of its Policies and Procedures with both the 1990 and 1991 statements. When the actual figures for 1992 became available, the union determined that 19% of its expenses for the year were non-germane and gave objecting pilots an adjusted credit or rebate with interest.

Appellants, still dissatisfied with the union's calculations and procedures, protested. The union, treating that protest—despite appellants' objection—as a request for arbitration under the union's Policies and Procedures, initiated arbitration proceedings. The Policies and Procedures specify that the American Arbitration Association (AAA) Rules for Impartial Determination of Union Fees govern such arbitrations, so, at the union's request, the AAA appointed an arbitrator in accordance with its rules from "a special panel of arbitrators experienced in employment relations." A number of the pilots had previously filed suit (before the agency shop agreement went into effect) against the union in federal district court and, wanting federal court resolution of all of their disputes regarding union fees, they asked the arbitrator not to proceed and sought a district court injunction to stop the arbitration. The district court denied the injunction, and the arbitrator refused to delay. The pilots' attorney consequently entered only a conditional appearance in the arbitration.

The arbitrator sustained most of the challenged union determinations as to which of its expenses were germane. Ninety-one of the 158 pilots who participated in the arbitration (either willingly or unwillingly) were parties in the district court suit; the other 67 of those who participated did not challenge the arbitrator's award. Sixty-two more who did not participate in the arbitration proceedings intervened in district court. We therefore have before us only the pilots who appeared before the arbitrator under protest or those who refused to do so at all.

The pilots who had been represented in arbitration had sought discovery, but the arbitrator refused to utilize his authority under the AAA rules to permit such. In district court, ALPA objected to the magistrate's discovery order requiring the union to produce all documents identifying the nature of and expenses related to 20 sample projects; it offered instead what the pilots regarded as impractical: all of its 1992 expense records. The district court cut short the discovery dispute by granting summary judgment against the pilots on almost all of their claims, with the exception of the effect of arbitration on the proceeding. The district court received additional briefing on the latter and subsequently ruled that arbitration was required. Relying on the arbitrator's factual findings, the district court affirmed ALPA's method of recordkeeping and its treatment of overhead expenses.

## II.

Appellants' most fundamental quarrel with the district court's opinion is directed at its conclusion that dissenter pilots were obliged to "exhaust" the arbitration procedures the union invoked before coming to court. (It will be recalled that some of appellants declined to go to arbitration and the others complied only under protest.) If they are correct on that issue, then the parties' dispute as to the scope of review of the arbitrator's decision is beside the point. Appellants' argument is simply this: We cannot be required to put to an arbitrator our claim against the union under federal law because we have never agreed to do so. That general proposition has been widely recognized by federal courts in a variety of circumstances. *See, e.g., AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 648–49, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986) (citing the *Steelworkers Trilogy*); *Gateway Coal Co. v. United Mine Workers of America,* 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974); *Blake Const. Co., Inc. v. Laborers' Int'l Union of North America, AFL–CIO,* 511 F.2d 324, 327 (D.C.Cir.1975). We have recently held that

dissident agency shop telephone company employees, similarly challenging an agency fee, were not obliged to accept a union's arbitration procedure in accordance with the union's constitution since they were not members of the union and never agreed to submit their dispute to arbitration. *Abrams v. Communications Workers of America,* 59 F.3d 1373, 1382 (D.C.Cir.1995).

The union and the district court, however, rely on another of our recent decisions, *Communications Workers of America v. American Telephone & Telegraph Co.,* 40 F.3d 426 (D.C.Cir.1994), in which we held that employees wishing to challenge decisions of pension plan administrators under federal law (ERISA) were obliged to exhaust administrative remedies before going to court. And the union would have us distinguish *Abrams* because the agency shop agreement there was governed by § 8(a)(3) of the National Labor Relations Act (NLRA), whereas in this case the parties are covered by § 2, Eleventh of the RLA. Under the RLA—but not the NLRA, according to the union—agency shop agreements threaten to trench on the First Amendment rights of those nonunion workers who are required, in part by operation of federal law, to make payments to the union. Since the dividing line between germane and nongermane activities has constitutional significance under the RLA, the union is *obliged* per the Supreme Court's decision in *Chicago Teachers Union Local No. 1 v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), to offer a neutral decisionmaker to dissident employees for prompt review of the union's allocation of its expenses between those categories. Therefore the union contends the dissidents should be reciprocally required to "exhaust" arbitration procedures; otherwise, the union would be forced frequently to litigate in both fora simultaneously—if some dissidents chose arbitration and others the federal court to pursue similar claims—causing it great expense and confusion.

■ We can readily distinguish *Communications Workers;* that parallels a true exhaustion case whereas this does not. The doctrine of exhaustion of administrative remedies typically is applied to ensure that senior officials in a government agency have authoritatively ruled, in accordance with available procedures, on an issue that a party attempts to bring to court based on a preliminary decision of a subordinate official. *See, e.g., Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938). In *Communications Workers,* we merely applied that reasoning to ERISA-governed pension plans. There, plan administrators had denied benefits to a claimant. But the plan provided for review of the administrators' decision by an Employee Benefit Committee, and we were unwilling to indulge the plaintiff's contention that an appeal to the committee necessarily would have been futile. Since under ERISA discretionary decisions of plan administrators determining eligibility for benefits or interpreting the terms of the plan are reviewed quite deferentially (abuse of discretion), *see Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989), we thought it particularly important that the decision we evaluated represent the considered and reasoned view of the highest plan authority. Thus, we extended the exhaustion doctrine to this nongovernmental structure. *Communications Workers,* 40 F.3d at 433.

■ This case, however, is far removed from the exhaustion paradigm. The arbitrator is not a senior official in the union hierarchy, and even if he were, there is no statutory ground to defer to either the union or the arbitrator on any of the issues presented in the case. The only reason an arbitrator's decision is normally afforded deference in a federal court is because the parties have *agreed* to put their dispute to him or her. *Cf. id.* at 434. The union does claim that the arbitrator's decision is entitled to deference but, in truth, the union's reasoning is circular. The arbitrator's decision, it is argued, should not be reviewed *de novo,* because if it were reviewed *de novo,* it would make little sense to force the pilots to go to arbitration in the first place—exposing the real question as whether the pilots were required to proceed to arbitration at all.

We therefore return to the union's argument that the pilots, in this situation, were

obliged to go to arbitration because the Supreme Court has compelled the union to offer arbitration to protect agency shop employees' constitutional rights, and it would be inconsistent with that scheme to force the union to defend itself before both an arbitrator and a federal court. The necessary corollary to that argument is the union's asserted distinction of *Abrams* as limited to the NLRA.

To understand the union's rather intricate position, it is necessary to analyze the basis for and the implications of the Supreme Court's determination in *Hudson* that a union representing public employees must offer nonmembers in an agency shop certain procedural protections to ensure that their First Amendment rights are not infringed. Previously, in *Abood v. Detroit Board of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Court had held that, although public employers could establish agency shops in which all employees, whether union members or not, are required to pay their share of the union's collective bargaining costs, nonmember employees, in turn, were entitled to "prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative." *Id.* at 234, 97 S.Ct. at 1799. *See also Brotherhood of Railway and Steamship Clerks v. Allen*, 373 U.S. 113, 118–19, 83 S.Ct. 1158, 1161–62, 10 L.Ed.2d 235 (1963); *International Ass'n of Machinists v. Street*, 367 U.S. 740, 769–70, 81 S.Ct. 1784, 1800–01, 6 L.Ed.2d 1141 (1961). In *Hudson*, the Court developed a set of requirements which would "protect[ ] the basic distinction drawn in *Abood*" and keep the agency shop from infringing on the First Amendment. *Hudson*, 475 U.S. at 302–03 & n. 12, 106 S.Ct. at 1073–74 & n. 12. Specifically, *Hudson* obliges those unions to provide an adequate explanation for the basis of their fees (including the major categories of expenses and verification by an independent auditor), "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker," and an escrow account in which fees are placed pending resolution of any fee disputes. *Id.* at 307 n. 18 & 310, 106 S.Ct. at 1076 n. 18 & 1077–78.

Justice White, concurring for himself and Chief Justice Burger, suggested the very position the union urges on us. He said, "if the union provides for arbitration and complies with the other requirements specified in our opinion, it should be entitled to insist that the arbitration procedure be exhausted before resorting to the courts." *Hudson*, 475 U.S. at 311, 106 S.Ct. at 1078 (White, J., concurring).

Although *Hudson*'s constitutional analysis was predicated on the premise that the union represented government workers and therefore its agency shop agreement with public employers' constituted "state action," the parties agree that the *Hudson* requirements similarly obtain vis-a-vis unions who negotiate agency shop agreements with private employers covered by the RLA. That is so because the Supreme Court in 1956 observed that the provision of the Railway Labor Act authorizing such agreements had to be read for constitutional reasons as limiting a union's ability to collect "dues ... as a cover for forcing ideological conformity or other action in contravention of the First Amendment." *Railway Emp. Dep't v. Hanson*, 351 U.S. 225, 232, 238, 76 S.Ct. 714, 718, 721, 100 L.Ed. 1112 (1956). The Constitution was thought implicated because agency shop agreements under the RLA carried the imprimatur of federal law. *Id.; see also Lancaster v. Air Line Pilots Ass'n Int'l*, 76 F.3d 1509, 1519 (10th Cir.1996); *Crawford v. Air Line Pilots Ass'n Int'l*, 992 F.2d 1295 (4th Cir.), *cert. denied*, 510 U.S. 869, 114 S.Ct. 195, 126 L.Ed.2d 153 (1993).

What is hotly disputed, however, is whether the obligation to provide prompt review by an impartial decisionmaker, rooted as it is in the protection of constitutional rights, extends to unions who gain agency shop agreements under § 8(a)(3) of the NLRA. If it is not, then *Abrams*' refusal to force the telephone workers to go to arbitration is distinguishable, the union claims, because the union there was not obliged *constitutionally* to offer arbitration. We are therefore backed into one of the more troublesome issues in labor law today and on which the circuits seem split—what is the legal basis and nature of a union's obligations to agency shop

employees under the NLRA. *Compare Price v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America,* 927 F.2d 88, 92 (2d Cir.) (finding no state action in an NLRA case to implicate *Hudson's* requirements), *cert. denied,* 502 U.S. 905, 112 S.Ct. 295, 116 L.Ed.2d 240 (1991), *with United Food and Commercial Workers Local 951 v. Mulder,* 31 F.3d 365 (6th Cir.1994) (assuming that *Hudson's* requirements apply in a case under the NLRA), *cert. denied,* —— U.S. ——, 115 S.Ct. 1095, 130 L.Ed.2d 1064 (1995).

As the union points out, however, this is not an entirely new question for us; we determined back in 1983 in *Kolinske v. Lubbers,* 712 F.2d 471 (D.C.Cir.) (holding the denial of strike benefits to nonstriking, nonmembers not unconstitutional) that under the NLRA an agency shop agreement does not amount to state action. We distinguished the Supreme Court's decisions discerning state action under the Railway Labor Act because that statute not only authorizes agency shops—and therefore puts a federal imprimatur on a collective bargaining agreement forcing an unwilling employee to pay a union an agency fee—it also preempts state law. *Id.* at 476–77. The NLRA, by contrast, in § 14(b) provides an option by which state law may ban a union shop and override the federal scheme. On reflection, it is not apparent why it is any less "state action," meaning governmental action, if both the federal and state governments combine (when the state chooses not to ban union shops) to provide a legal regime whereby an employee who refuses to join a union is still obliged to pay an agency fee. Nevertheless, it is not open to us to depart from our prior holding.

Still, the Constitution's applicability to union shop clauses under the NLRA is not determinative as to the union's obligation to provide *Hudson* procedures to nonmembers. Subsequent to *Kolinske,* the Supreme Court decided the crucially important *Communications Workers v. Beck,* 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988), and although it declined to determine whether the Constitution had the same application to agency shop agreements under the NLRA as it does under the RLA, *id.* at 761, 108 S.Ct.

at 2656–57, it did hold that the statutory authorization to operate union shops under § 8(a)(3) was coextensive with that under § 2, Eleventh of the RLA. *Id.* at 752, 108 S.Ct. at 2652. Both statutes, similarly worded, permit unions to reach agreements with employers that compel employees to pay agency shop fees only to the extent that those fees are "necessary to finance collective bargaining activities." *Id.* at 759–62, 108 S.Ct. at 2655–57. Any greater exaction would violate the union's legal duty of fair representation. *Id.* at 742–43, 762–63, 108 S.Ct. at 2647–58, 2657–58. We see no reason why this statutory duty of fair representation owed to nonmember agency shop employees carries any fewer procedural obligations than does a constitutional duty. We therefore do not believe it is possible to distinguish *Abrams* on the ground that the union's proposed arbitration of the dispute there was wholly voluntary. We recognized as much in *Abrams,* albeit in passing: "Although in *Hudson* the challenge to the union agency fee was made on constitutional grounds, its holding on objection procedures applies equally to the statutory duty of fair representation inasmuch as the holding is rooted in '[b]asic considerations of fairness, as well as concern for the First Amendment rights at stake.'" *Abrams,* 59 F.3d at 1379 n. 7 (quoting *Hudson,* 475 U.S. at 306, 106 S.Ct. at 1075–76).

We do not think, then, that the union's attempted distinction of *Abrams* is persuasive, but to be fair, that case is not wholly dispositive because we were not faced with the argument that the union mounts here, which is based on Justice White's concurrence in *Hudson.* It is an argument that has found a mixed response: The circuits are split as to whether a union, obliged by federal law to offer *Hudson*-style arbitration to nonmembers challenging the amount of agency fees that they are charged, is entitled to insist on "exhaustion" before the dissident employees come to federal court. *Compare Lancaster v. Air Line Pilots Ass'n Int'l,* 76 F.3d 1509, 1521–23 (10th Cir.1996) (reading *Hudson,* including Justice White's concurrence, to require excusable exhaustion of arbitration to avoid the wasteful expenditure of time and money) *and Hudson v. Chicago*

*Teachers Union, Local No. 1,* 922 F.2d 1306, 1314 (7th Cir.) (federal courts should not review fee calculations at the notice stage because it would involve the courts in the micromanagement of fee calculation), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991), *with Bromley v. Michigan Educ. Association–NEA,* 82 F.3d 686, 694 (6th Cir.1996) (criticizing the district court's opinion in the present case and holding that there is no exhaustion requirement), *cert. denied,* —— U.S. ——, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997), *and Hohe v. Casey,* 956 F.2d 399, 409 (3d Cir.1992) (discussing the issue in dicta and reading *Hudson* as only requiring arbitration as an alternative, not a precursor, to litigation).

We observed this division once before in *Beckett v. Air Line Pilots Ass'n,* 995 F.2d 280, 285 (D.C.Cir.1993), but we did not have to choose sides in that case. Here we do. Although we recognize that Justice White raised a legitimate *practical* concern directed at the quasi-legislative scheme that the majority adopted in *Hudson,* we simply see no *legal* basis for forcing into arbitration a party who never agreed to put his dispute over federal law to such a process. Nor is there anything in the *Hudson* majority opinion that even suggests that the Court thought it was putting protesting agency shop employees in that position.[1] We therefore align ourselves with the Sixth and Third Circuits in holding that an employee who wishes to bring an action in federal court is not obliged to proceed first to arbitration, at the union's option.

That does not mean we are insensitive to the union's problem of defending its actions simultaneously in two separate fora. There is a rather strange relationship between the union and the dissenting pilots; it is certainly not the kind that gives rise to a continuing smooth recourse to an agreed-upon method of resolving disputes. But surely given the disincentives both sides face, it is not inconceivable that all the dissenting pilots could be persuaded to agree to arbitration, perhaps if the pilots felt they had more say in the selection of the arbitrator and the rules governing the proceeding. It may well be, for instance, that the arbitrators chosen by the AAA from a group "experienced in labor matters" would not be perceived as typically sympathetic to such plaintiffs (or their counsel). The union may well entertain visceral objections to engaging in a kind of collective bargaining over dispute resolution procedures with the nonmembers, but practical concerns might well, as the union itself emphasizes, predominate.

Assuming, however, that the union faces continuous litigation in federal court, it does not follow that it will necessarily be obliged simultaneously to offer arbitration. *Hudson,* it should be remembered, did not require arbitration *per se.* Rather, it required a "reasonably prompt decision by an impartial decisionmaker." 475 U.S. at 307, 106 S.Ct. at 1076. If unions are brought into federal court each year on agency fee challenges as ALPA fears, presumably the same district judge will hear those cases. To the extent the court gains familiarity with the union's procedures and practices, federal court decisions themselves may satisfy *Hudson's* requirement if the proceedings move relatively quickly. The unions can also assist the courts in speeding up the process by making pre-trial concessions regarding discovery and other time-sensitive matters. The Court in *Hudson* seemed to recognize this very possibility when it noted that "[c]learly, ... if a State chooses to provide extraordinarily swift judicial review for these challenges, that review would satisfy the requirement of a reasonably prompt decision by an impartial decisionmaker." *Id.* at 308 n. 20, 106 S.Ct. at 1076 n. 20.

Effective use of class action procedures may also minimize ALPA's concerns. Nonmembers may well elect to bring their claims as a class. *See, e.g., Abrams,* 59 F.3d at 1378; *Hudson,* 922 F.2d at 1308. A class consisting of all agency shop nonmembers can be certified to challenge the adequacy of a union's notice, *see Abrams,* 59 F.3d at 1378,

---

**1.** Although the majority did not explicitly reject Justice White's concern, it did specify that "[t]he arbitrator's decision would not receive preclusive effect in any subsequent § 1983 action." *Hudson,* 475 U.S. at 308 n. 21, 106 S.Ct. at 1077 n. 21.

and courts may also certify a class of non-members who have specifically objected to the exaction of fees without running afoul of the Supreme Court's decision in *Street. Id.*

In sum, we think the parties and their counsel may well be able to devise procedures that will provide dissenting pilots with their legal rights and yet not unduly burden the union.

## III.

Although our decision sustaining appellants' right not to go to arbitration necessarily means this case must be remanded to the district court—the arbitrator's decision is no longer a part of the legal picture—there are certain issues presented by the parties that are straight questions of law and therefore should be decided now; there is no reason to remand. Perhaps the most important of those questions relates to ALPA's air safety "activities," which the union claims are germane to collective bargaining. The arbitrator and the district judge—apparently resting her decision on an independent legal analysis—agreed with the union. But the pilots claim that they are being charged in part with certain union activities that involve lobbying government agencies and, in accordance with *Hudson*'s reasoning, these activities cannot be considered germane to collective bargaining.

The union, although it objects to appellants' use of the term "lobbying," does not dispute that a portion of its expenses involves its contacts with government agencies and Congress concerning the union's views as to appropriate federal regulation of airline safety—which even includes intervention with the President and members of the Senate concerning appointments to the National Transportation Safety Board. ALPA contends, however, that its government relations activities are interconnected with those airline safety issues that animate much of its collective bargaining and therefore they should be regarded as germane to that bargaining.

There are major difficulties with the union's position. If there is any union expense that, given the logic of *Hudson* and its proge-ny, must be considered furthest removed from "germane" activities, it is that involving a union's political actions. After all, whether one considers the RLA's limitation on the union's use of nonmembers' compelled agency fees to be constitutionally required or inspired, it is nonetheless nonmembers' First Amendment-type interests that are protected. And it is hard to imagine those interests more clearly placed in jeopardy than when the union uses the dissidents' money to pursue political objectives. The union would have us see its lobbying on safety-related issues as somehow nonpolitical because all pilots share a common concern with these activities. But we cannot possibly assume that to be true. All pilots are surely interested in airline safety, but it would certainly not be unexpected that pilots would have varying views as to the desirability of government regulation—including those regulations of airlines that pertain to safety. The benefits of any regulation include trade-offs, and certain pilots might be reluctant to pay the costs either directly or indirectly of increased regulations, just as others might oppose relaxed regulations that could expand work opportunities. Some, of course, might even object to such regulations on principle.

That the subject of safety is taken up in collective bargaining hardly renders the union's government relations expenditures germane. Under that reasoning, union lobbying for increased minimum wage laws or heightened government regulation of pensions would also be germane. Indeed if the union's argument were played out, virtually all of its political activities could be connected to collective bargaining; but the federal courts, including the Supreme Court, have been particularly chary of treating as germane union expenditures that touch the political world. *See Beckett v. Air Line Pilots Ass'n,* 59 F.3d 1276, 1281 (D.C.Cir.1995) (Silberman, J., concurring) (observing that the Supreme Court treats litigation as non-germane perhaps because it regards litigation as a continuation of the political process). *See also Lehnert v. Ferris Faculty Ass'n,* 500 U.S. 507, 516, 111 S.Ct. 1950, 1957, 114 L.Ed.2d 572 (1991) (expenses are not germane to collective bargaining "at least in the private sector" if they involve political or ideological activities); *El-*

*lis v. Brotherhood of Ry., Airline and Steamship Clerks, Freight Handlers, Express & Station Employees,* 466 U.S. 435, 447–48, 104 S.Ct. 1883, 1891–92, 80 L.Ed.2d 428 (1984); *Street,* 367 U.S. at 768, 81 S.Ct. at 1799–1800.

To be sure, in *Lehnert* the Supreme Court recognized an exception to this principle for public sector unions because "[t]he dual roles of government as employer and policymaker in such cases make the analogy between lobbying and collective bargaining in the public sector a close one." . 500 U.S. at 519–20, 111 S.Ct. at 1959–60. ALPA would have us extend this limited exception to this case because safety standards can be the result of either collective bargaining or government action and indeed, the latter may foreclose the former. But, as we have explained, that extension of the *Lehnert* exception would swallow the *Lehnert* rule. On remand, therefore, the district court should draw a line between safety-related collective bargaining expenditures and those relating to the union's government relations.

## IV.

▮ The pilots raise a number of additional claims, some of which can also be decided as a matter of law—others of which must be remanded. The 1990 and 1991 statements allegedly constituted inadequate notice under *Hudson* because they were not "audited"— even though the 1992 statement, under which fees were ultimately levied, was. We agree with ALPA that the pilots have failed to establish that they have standing to raise this claim, because the pilots were not injured by the alleged inadequacy. They did not suffer as a result of inadequate information on which to base an objection because they did submit a timely objection. And ALPA rebated the difference plus interest, from an escrow account, between the amount of actual expenses in 1992 and the estimates from the 1990 and 1991 statements. A formally audited notice would have changed nothing because Price Waterhouse verified ALPA's accounting in 1990 and 1991, and the pilots have not alleged that a more formal audit would have produced a different collection of fees initially—they complain only that the

1992 fees were ultimately lower than the estimates made from 1990 and 1991.

ALPA also did not provide the pilots with "reasonably prompt" review, under the pilots' rationale, because their first opportunity to challenge the 1992 statement was in mid-1993, and they could not challenge the 1990 or 1991 statements earlier than that. We agree with ALPA that since the pilots did not request arbitration with respect to either the 1990 or 1991 statements, and since they have protested attending *any* arbitration before being allowed in court, they cannot now complain that the arbitration should have been available earlier. This problem will not recur in any event because the issue arose in this case only because the agency shop agreement did not take effect until 1992. In the future pilots can, if they wish, request arbitration in any given year of the prior year's statement, because that same statement will determine both their final agency fee for the preceding year and their tentative fee for the current year.

▮ The pilots also contend that the district court erred in granting ALPA summary judgment on their challenge to the audit of the 1992 statement. The district court interpreted the pilots' claim to be that Price Waterhouse did not audit the "germane/nongermane calculation" nor "examine . . . [ALPA's] expenditures in each project code." The court reasoned that auditors need not make the legal determination of whether an expense is germane. It further concluded, after reading the declaration of the pilots' expert, that the pilots conceded that Price Waterhouse's review "provid[ed] the assurance that sums allocated to project codes are actually expended in support of those codes." This was enough, in the district judge's view, to permit summary judgment for ALPA.

Insofar as the district court rejected the pilots' request that an auditor make legal determinations of whether expenses are germane or not germane, we agree. *See Dashiell v. Montgomery County,* 925 F.2d 750, 755 (4th Cir.1991); *Gwirtz v. Ohio Educ. Ass'n,* 887 F.2d 678, 682 n. 3 (6th Cir.1989), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1810, 108 L.Ed.2d 941 (1990); *Ping v. National Educ. Ass'n,* 870 F.2d 1369, 1374 (7th Cir.

1989); *Andrews v. Educ. Ass'n of Cheshire,* 829 F.2d 335, 340 (2d Cir.1987). Irving Ross, appellants' expert, devoted most of the space in his declaration to criticizing Price Waterhouse's inadequate evaluation of whether expenses were properly treated by ALPA as germane and whether *Hudson* was satisfied. These are matters of law, not accounting, and we cannot expect accountants to conduct the analysis of whether an expense was necessarily or reasonably incurred as part of the union's collective bargaining duties. *Hudson* auditors are not different from other auditors whose "usual function is to ensure that the expenditures which the union claims it made for certain expenses were actually made for those expenses." *Andrews,* 829 F.2d at 340. There is, therefore, nothing legally deficient with Price Waterhouse's reliance on the "definitions, significant factors, and management assumptions" made by ALPA in dividing its expenses between germane and nongermane.

But the pilots claim that Ross also questioned whether Price Waterhouse violated generally accepted accounting principles in the *manner* by which it conducted the audit, and therefore his declaration created a factual dispute immune from summary judgment. The professional adequacy of the *Hudson* audit is certainly a proper subject for review by a judge or an arbitrator. ALPA would have us hold that, in the absence of allegations of fraud or willful misconduct, a court or arbitration panel should not inquire whether the *Hudson* audit was properly performed. Although *Hudson* does not require that every underlying record and document be discoverable by objecting members' accounting experts, as Ross suggests, we disagree that the methodology of the auditor may not be questioned for anything but fraud or intentional deception. *Hudson* did not stand for the proposition that a rubber stamp by an accountant stating "this was audited" meets the constitutional minimum it envisioned.

In that regard, we read Ross' declaration as creating a factual dispute over the adequacy of Price Waterhouse's audit, including, as the district court phrased it, the propriety of the "assurance that the sums allocated to project codes were actually expended in support of those codes." Ross challenged Price Waterhouse's methodology by noting that the audit itself was meant to assist a particular group of users—the nonmembers—in determining whether or not to object to the agency shop fee. Under the particular form of audit selected by Price Waterhouse,[2] the auditor is advised:

> When expressing an opinion on one or more specific elements, accounts, or items of a financial statement, the auditor should plan and perform the audit and prepare his or her plan report with a view to the purpose of the engagement.

Ross contended that Price Waterhouse planned and performed the audit in a manner contrary to the needs of its users and therefore below auditing standards. Ross then focused on several particular aspects of the audit as deficient under generally accepted auditing standards. He criticized, for example, the sample size of paychecks evaluated by Price Waterhouse (24 to be exact) as "unacceptably small" for a $26 million payroll. He also chastised Price Waterhouse for its failure to contact those 24 employees directly to determine what work they did (which could then be compared to the allocation of their time to project codes) and for the auditors' similar treatment of non-payroll disbursement. Out of 31,000 non-payroll disbursements, Price Waterhouse investigated 116—a number he claimed "too few" for an audit of this kind.

This is not to suggest that all of Ross' criticisms raise factual issues—for as we said, the allocation of expenses into germane and nongermane categories is not a matter that an accountant can "audit." An auditor can certainly verify that money claimed to be spent was actually expended on the particular activity claimed, but he need not—nor do we see how he could—evaluate and characterize the nature of the activity itself for purposes of applying the RLA. For that reason, we remand for the district court's

---

2. Price Waterhouse conducted the statement audit in accordance with "SAS–62, the Statement of Auditing Standards 62 Special Reports," which was issued by the Accounting Principles Board, the senior technical body of the American Institute of Certified Public Accountants.

consideration appellants' claim that the methodology failed to comply with generally accepted auditing principles.

The pilots' related attack on ALPA's recordkeeping of germane and nongermane expenditures, including its treatment of "overhead" expenses, is properly leveled not on the audit, but on ALPA's adequacy of proof. The "union bears the burden of proving the proportion of chargeable expenses to total expenses." *Lehnert*, 500 U.S. at 524, 111 S.Ct. at 1962. The pilots contend that "ALPA's method of tracking costs and determining which are germane and nongermane is not sufficiently reliable" to meet this burden. They also challenge ALPA's "germane" categorization of administrative expenses, which support all of the union's activities, such as rent, administrative salaries, equipment maintenance, and general supplies. The district court relied on the arbitrator's findings of fact and held that ALPA had provided enough detail about its calculations to meet *Hudson*'s requirements. In light of our holding above that the pilots were not required to exhaust arbitration, we reverse and remand for the district court to reach independent factual findings.

This, of course, raises the question of what records ALPA must provide to the pilots in discovery so that they may challenge ALPA's assertions that the expenses were properly charged. The pilots obviously need some minimal level of access, *see Bromley*, 82 F.3d at 696, but it is equally clear that *Hudson* did not ordain a sweeping inquiry into all of ALPA's receipts. *See Hudson*, 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18. We leave discovery management to the district court, but some sort of sampling technique might well provide the appropriate balance between the nonmembers' interest in data that is accessible and informative and the union's concerns that the request be manageable. It is just as inadequate for the union to force nonmembers to plough through an entire warehouse of receipts without organizing the information in some fashion as it is for the union to supply nothing at all. It is the district court's responsibility to decide the

appropriate middle ground between the two extremes.