125 F.3d 865
 156 L.R.R.M. (BNA) 2321, 326 U.S.App.D.C. 338,
134 Lab.Cas. P 10,054
 Lawrence R. FERRISO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
International Union of Electronic, Electrical, Salaried,
Machine and Furniture Workers, AFL-CIO and
Engineers Union Local 444, Intervenors.
 No. 96-1321.
 United States Court of Appeals,
 District of Columbia Circuit.
Argued Sept. 3, 1997.
Decided Sept. 23, 1997
Rehearing Denied Nov. 19, 1997.
 
 On Petition for Review of an Order of the National Labor Relations Board.
 Raymond J. LaJeunesse, Jr. argued the cause and filed the briefs for petitioner.
 Richard Cohen, Senior Attorney, National Labor Relations Board, Washington, DC, argued the cause for respondent, with whom Linda Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on the brief.
 James B. Coppess, Washington, DC, argued the cause for intervenors, with whom Laurence S. Gold and Peter E. Mitchell were on the brief. James G. Mauro, Jr., Washington, DC, and Sheldon Engelhard, Boca Raton, FL, entered appearances.
 Before: WALD, WILLIAMS and GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 Lawrence R. Ferriso ("Ferriso"), although not a member of the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, or its Local 444 (respectively, the "International" and the "Local"; collectively, the "Unions"), is required to pay fees to the Unions by virtue of an "agency-shop" agreement between the Unions and Ferriso's employer, Paramax Systems Corporation. Agency-shop agreements require all of a bargaining unit's employees, whether or not they are union members, to pay fees (termed "agency fees") to a union for the benefits that the union confers on them, including collective bargaining and other forms of representation. When Ferriso requested that the International reduce his agency fees to reflect only those expenses properly chargeable to him, the International did so, but without providing any explanation of its calculations other than a list of what percentage of the expenses of each of its affiliates it believed was chargeable to Ferriso. Believing that the Unions were obliged to justify their calculations of his agency fees with a breakdown of their major categories of expenditures, verified by an independent audit, Ferriso filed an unfair labor practice charge with the National Labor Relations Board ("the NLRB" or "the Board"). The NLRB found that the Unions were required to provide Ferriso with data on their major categories of expenditures, but that no independent audit was necessary. On appeal, Ferriso argues that the latter finding was erroneous. The Unions have intervened, and argue, with the Board, that this ruling should be upheld.
 
 
 2
 We conclude that Ferriso is correct, and that the Unions are required to provide him with an independent audit of their major categories of expenditures. We also find that the Board's apparent methodology for ascertaining what constitutes an appropriate audit is incorrect, and that such audits must, in general, conform to the ordinary norms for audits of comparable entities.
 
 I. BACKGROUND
 
 3
 Ferriso joined the Local in 1974; in 1976, he resigned, but continued to pay dues to the Unions because of the agency-shop agreement. In March 1991, he read a notice in the union newsletter about procedures for reducing nonmembers' agency fees to eliminate charges for nonrepresentational activities. The notice said that objectors would receive a "detailed explanation" of the basis of the reduction and that any challenges would be resolved by an impartial arbitrator.
 
 
 4
 Ferriso sent a letter seeking a reduction. In June, he received a letter that said that the Union had reviewed its records and had reduced Ferriso's agency fee so that it only reflected collective-bargaining or representational costs. The letter listed the amounts of Ferriso's fees that went to the Local, to District Council 3 (a regional affiliate of the Unions), and to the International. It also indicated the percentage of the fees paid to each that were chargeable to Ferriso: 58.1 percent for the International, 65 percent for the District, and 98.9 percent for the Local. Ferriso's dues subsequently dropped in accordance with the calculations set forth in the letter.
 
 
 5
 The letter did not provide any of the expense information underlying the Unions' calculations, and did not indicate that these calculations had been verified by any third party. It did describe the procedure by which Ferriso could challenge the calculations before an arbitrator. Ferriso elected not to invoke this procedure, and instead filed an unfair labor practice charge with the NLRB against the International and the Local, claiming that they had failed to provide him with sufficient information to allow him to decide whether to challenge their calculations. The NLRB General Counsel issued a complaint, and the case was tried before an administrative law judge ("ALJ").
 
 
 6
 On December 2, 1992, the ALJ issued an opinion finding that the unions had violated section 8(b)(1)(A) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(1)(A) (1994), by (i) failing to give Ferriso a breakdown of their major categories of expenses, and (ii) failing to have this breakdown verified by an independent auditor. International Union of Electronic, Electrical, Machine and Furniture Workers, Case No. 29-CB-8055 (Dec. 2, 1992). The Unions filed exceptions to this decision. On August 27, 1996, the Board issued a decision in which it adopted the ALJ's first finding, but declined to adopt the second, finding that verification by an independent auditor was not necessary. International Union of Electronic, Electrical, Machine and Furniture Workers AFL-CIO, Engineers Union, Local 444, 322 N.L.R.B. No. 1, 1996 WL 501580 (Aug. 27, 1996) (hereinafter "IUE"). Ferriso now appeals the latter ruling.
 
 II. ANALYSIS
 
 7
 In Communications Workers of America v. Beck, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988), the Supreme Court explained the purpose of section 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3) (1994), which permits unions and employers to enter into agency-shop agreements. The Court found that, in enacting this provision of the NLRA, Congress "authorized compulsory unionism only to the extent necessary to ensure that those who enjoy union-negotiated benefits contribute to their cost." Beck, 487 U.S. at 746, 108 S.Ct. at 2649. The Court accordingly concluded that section 8(a)(3) "authorizes the exaction of only those fees and dues necessary to 'performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues,' " Id. at 762-63, 108 S.Ct. at 2657 (quoting Ellis v. Brotherhood of Railway, Airline & Steamship Clerks, 466 U.S. 435, 448, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428 (1984)). The Court described activities "germane to collective bargaining, contract administration, and grievance adjustment" as the "financial core" of union activities, which nonmembers may appropriately be compelled to support. Id. at 745, 108 S.Ct. at 2648.
 
 
 8
 A union's status as an exclusive bargaining representative gives rise to "a statutory obligation to serve the interests of all members [of the bargaining unit] without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967). This obligation is also called the duty of fair representation; actions for breach of this duty may be brought under section 8(b) of the NLRA, 29 U.S.C. § 158(b) (1994). See Vaca, 386 U.S. at 176, 87 S.Ct. at 909. In Beck, the Court explained that nonmembers can bring a claim for improperly charged agency fees as a breach of the duty of fair representation, as the claim amounts to one that the union "failed to represent their interests fairly and without hostility by negotiating and enforcing an agreement that allows the exaction of funds for purposes that do not serve their interests and in some cases are contrary to their personal beliefs." 487 U.S. at 743, 108 S.Ct. at 2647-48.
 
 A. The Independent-Auditor Requirement
 
 9
 Beck did not address how unions were to verify their calculations of the proportion of expenses attributable to representational activities. However, the Court considered a related issue in Chicago Teachers Union v. Hudson, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). Hudson involved an agency-shop arrangement negotiated by the Chicago Teachers Union and the Chicago Board of Education. Because this arrangement was the result of state action, the First Amendment barred the union from including expenditures for "ideological activities unrelated to collective bargaining" in the agency fees it charged to nonmembers. Hudson, 475 U.S. at 305, 106 S.Ct. at 1075 (quoting Abood v. Detroit Board of Education, 431 U.S. 209, 244, 97 S.Ct. 1782, 1804, 52 L.Ed.2d 261 (1977) (Stevens, J., concurring)). The union had established a procedure under which nonmembers who objected to the amount of their fees could challenge them through a procedure that culminated in arbitration; those who prevailed would then be issued a rebate of any excess charges. The Hudson Court found that this procedure fell short of constitutional standards in three respects: it did not provide sufficient assurance that funds would not be temporarily misused before a rebate was issued; it did not provide enough information about the basis of the union's calculations to allow nonmembers to make an informed decision about whether to bring a challenge; and it did not provide an adequately prompt opportunity for review by an impartial decisionmaker. Id. at 305-07, 106 S.Ct. at 1075-76. In discussing the second of these requirements, the Court observed that "[t]he Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor." Id. at 307 n. 18, 106 S.Ct. at 1076 n. 18.
 
 
 10
 Hudson does not apply directly to this case, because of the lack of state action. See Kolinske v. Lubbers, 712 F.2d 471 (D.C.Cir.1983) (finding that the NLRA's provision permitting agency-shop agreements does not suffice to render such agreements state action). But this circuit has found that the content of the NLRA's duty of fair representation is guided by the standards of Hudson. In Abrams v. Communications Workers of America, 59 F.3d 1373 (D.C.Cir.1995), we noted that the holding of Hudson was rooted in " '[b]asic considerations of fairness, as well as concern for the First Amendment rights at stake,' " and so "applies equally to the statutory duty of fair representation." 59 F.3d at 1379 n. 7 (quoting Hudson, 475 U.S. at 306, 106 S.Ct. at 1076). We accordingly adopted Hudson's standard for the nature of the disclosure that unions must make under the NLRA to nonmembers of the right to opt out and pay less than full union dues. See also Miller v. Air Line Pilots Ass'n, 108 F.3d 1415, 1420 (D.C.Cir.1997) (finding that Hudson and Beck impose similar procedural obligations on unions, and therefore applying, in a case governed by Hudson, the holding of Abrams that employees may not be compelled to arbitrate agency-fee disputes).
 
 
 11
 Here, the NLRB found that Hudson's "major categories of expenditures" requirement is applicable under the NLRA, but that its "independent auditor" requirement is not. The NLRB based this conclusion on its previous decision in California Saw & Knife Works, 320 N.L.R.B. 224, 1995 WL 791959 (1995) (hereinafter "California Saw "). Citing Abrams, California Saw had found that, because Hudson was based in part on "basic considerations of fairness," its conclusions were applicable under the NLRA. 320 N.L.R.B. at 232-33. But the Board concluded in California Saw that the Court's "basic considerations of fairness" rationale "expressly extended only to the notice requirement." Id. 320 N.L.R.B. at 233 n. 48. Because, with the exception of this requirement, the standards of Hudson "were not formulated to comport with a union's obligations under Beck to represent its employees fairly," the Board concluded that Hudson's "independent auditor" requirement did not apply to actions brought under the NLRA. Id. 320 N.L.R.B. at 240-41. The Board apparently believed that "the more exacting accounting standards in Hudson derive from first amendment intolerance of any compulsory subsidization of fees under a state-authorized agency shop," id. 320 N.L.R.B. at 240 n. 82, and therefore should not apply to a case in which there is no question of state action. Although the Board rejected Hudson's "independent auditor" formula, it did find that some form of verification was required, stating that it would examine whether the verification arrangement before it satisfied the union's duty of fair representation under Beck. Id. 320 N.L.R.B. at 241.[1]
 
 
 12
 The NLRA does not speak directly to the question of whether an independent audit is required in these circumstances. In cases in which the NLRA is "silent or ambiguous as to the specific issue" before us, Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), "we have traditionally accorded the Board deference with regard to its interpretation of the NLRA as long as its interpretation is rational and consistent with the statute." NLRB v. United Food & Commercial Workers Union, 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987). Ferriso points out that the Supreme Court has said that "fair representation claims often involve matters not normally within the Board's unfair labor practice jurisdiction, which is typically aimed at effectuating the policies of the federal labor laws, not redressing the wrong done the individual employee," and expressed doubts as to "whether the Board brings substantially greater expertise to bear on these problems than do the courts." Breininger v. Sheet Metal Workers International, 493 U.S. 67, 74, 110 S.Ct. 424, 430, 107 L.Ed.2d 388 (1989) (citations and internal quotations omitted). But in this passage the Court was considering only whether the NLRB's jurisdiction over fair representation claims should be exclusive, not whether the Board's decisions were entitled to Chevron deference. It is one thing to say, as the Court did in Breininger, that the Board's expertise in this area does not so dwarf that of the courts as to justify depriving the courts of jurisdiction to hear fair representation claims, and quite another to deny that the Board has any special expertise in this area at all. This circuit has heretofore accorded the NLRB the usual measure of Chevron deference in matters relating to the duty of fair representation, see Finerty v. NLRB, 113 F.3d 1288, 1291 (D.C.Cir.1997), and Breininger does not justify a significant departure from this practice.
 
 
 13
 We nevertheless find that the Board's rejection of the "independent auditor" requirement was not rational, because any rational interpretation of the NLRA's duty of fair representation will necessarily include an independent-auditor requirement. First, the Board was mistaken in finding that Hudson' § "basic considerations of fairness" language did not extend to its "independent auditor" requirement. Hudson found that "[b]asic considerations of fairness" required that "potential objectors be given sufficient information to gauge the propriety of the union's fee." 475 U.S. at 306, 106 S.Ct. at 1076. The Court then explained in a footnote what it meant by "sufficient information," saying that "adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor." 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18. It follows that everything encompassed by the latter phrase, including "verification by an independent auditor," is required by "basic considerations of fairness."
 
 
 14
 California Saw suggested that the independent-auditor requirement might be peculiar to cases involving state action, observing that Hudson's "more exacting accounting standards" derived from "first amendment intolerance of any compulsory subsidization of fees under a state-authorized agency shop." California Saw, 320 N.L.R.B. at 240 n. 82. We do not agree. Hudson grounded its discussion of information disclosure in both "basic considerations of fairness" and "concern for the First Amendment rights at stake," 475 U.S. at 306, 106 S.Ct. at 1076, indicating that its disclosure requirements were not exclusively the product of First Amendment concerns. It is, of course, conceivable in the abstract that the content of the duty of fair representation under the NLRA might not coincide with that of the "basic considerations of fairness" discussed in Hudson. But we are persuaded that nonmembers cannot make a reliable decision as to whether to contest their agency fees without trustworthy information about the basis of the union's fee calculations, cf. Hudson, 475 U.S. at 306, 106 S.Ct. at 1075-76, and that an independent audit is the minimal guarantee of trustworthiness. See Miller, 108 F.3d at 1420 (holding that similar procedural obligations apply under NLRA and Hudson ); Abrams, 59 F.3d at 1379 n. 7 (same).
 
 
 15
 California Saw cited legislative history in support of its rejection of an independent-audit requirement, observing that, in the process of deliberating on what was to become the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), the House considered but did not adopt proposals requiring unions to obtain independent audits. 320 N.L.R.B. at 241 n. 87. It is true that one of the bills that the House considered, H.R. 4473, would have required the financial records of unions to be independently audited, and that these provisions did not appear in the bill ultimately adopted by the House. See H.R. 4473 §§ 102(b)(10), 211(b), 86th Cong. (1959), reprinted in 1 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 at 193, 237 (1959) (hereinafter "Leg. Hist.").[2] The Beck Court, however, rejected a similar argument based on the LMRDA's legislative history, noting that the House bill in question "did not purport to set out the rights of nonmembers who are compelled to pay union dues, but rather sought to establish 'a bill of rights for union members.' " 487 U.S. at 758, 108 S.Ct. at 2655 (quoting H.R.REP. NO. 245, 80th Cong., 1st Sess. at 322 (1947)). The title and provisions of H.R. 4473 make clear that it, too, was addressed exclusively to the rights of union members. See, e.g., Title, 1 Leg. Hist. at 166 (referring to rights of union members); § 101(a), 1 Leg. Hist. at 174-75 (same). We therefore do not find this argument persuasive.
 
 
 16
 B. Who Counts as an "Independent Auditor"?
 
 
 17
 The question remains of what suffices to satisfy the requirement of an "independent auditor" under the NLRA--what qualifications and what degree of independence the auditor must have. The Board and the Unions argue that we should not reach these issues, as they were not properly raised below. As to the question of what form of professional certification or license is required, the Board concedes that the General Counsel argued both before it and before the ALJ that verification by an independent auditor meant verification by an "independent accounting firm," and that Ferriso argued before the Board that it meant verification by a "certified public accountant," i.e., a CPA. NLRB Brief at 5-6. This issue was therefore adequately raised.
 
 
 18
 As to the meaning of "independent," it is appropriate to reach this question in order to correct an error in the methodology the Board applied in California Saw. Although California Saw rejected the "independent auditor" formula, it did require some form of verification of a union's financial data. In the absence of any counterindications from us, the Board might choose to draw on the methodology it applied in California Saw for analyzing unions' data-verification arrangements in giving content to the "independent auditor" standard on remand. Some discussion of the reasoning of California Saw is therefore necessary.[3]
 
 
 19
 California Saw found that Beck was satisfied by an arrangement under which the international union was audited by outside CPAs, but the audits of the district and local unions were conducted by employees of the international union who were not CPAs. The Board found that because the auditors had accounting training, had served as Local or District treasurers, and applied an audit protocol developed by the union with an outside consultant, "the General Counsel has not demonstrated that the verification of expenses tasks at issue here are beyond the skills of the [union] auditors." California Saw, 320 N.L.R.B. at 241. As to auditor independence, the Board found that the union took "significant steps to assure objectivity" because auditors were not permitted to audit affiliates for which they currently or formerly worked or of which they were members. Id. 320 N.L.R.B. at 241-42. The Board also observed that there had been no allegations that audits had been performed "in a less than honest, unbiased, or objective manner," and that the international union had an independent interest in obtaining objective audits of the books of its affiliates. Id. 320 N.L.R.B. at 242.
 
 
 20
 The Board's methodology contained two errors. First, it imposed very little scrutiny on the verification arrangement before it, finding it sufficient that the audit had not been demonstrated to be "beyond the skills" of the auditors, and that the union had taken "significant steps" towards assuring objectivity. Second, and more seriously, it made no reference to the accepted norms of the accounting profession in analyzing the expertise and independence of the auditors. Federal and state authorities and professional associations have devoted considerable effort to developing standards of independence and professionalism for audits of businesses, employee benefit plans, and the like; potential objectors to agency fees should not be required to rely on an audit that does not meet the prevailing standards for audits of other comparable entities.[4]
 
 
 21
 The Court emphasized in Hudson that "absolute precision" in the calculation of agency fees "cannot be expected or required," Hudson, 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18 (quoting Abood, 431 U.S. at 239-40, n. 40, 97 S.Ct. at 1801-02, n. 40). Similarly, an audit under the NLRA need only conform to the prevailing norms for an adequate audit. See Gwirtz v. Ohio Education Ass'n, 887 F.2d 678, 680-82 (6th Cir.1989) (approving use of an "adequate" auditing standard that falls short of the "highest level of audit service available"); see also Abrams, 59 F.3d at 1381 (approving a procedure under which union employees keep records of their time for only one week out of thirteen). The nature of an adequate audit may vary depending on the size and complexity of the auditing task, as this may affect the types of entities with which the union may appropriately be compared. The following is a summary of some of the relevant norms that we have identified, and of their likely implications, to guide the Board's decision on remand.
 
 
 22
 1. "Independent"
 
 
 23
 The American Institute of Certified Public Accountants ("AICPA") has promulgated a wide range of standards of accounting and auditing practice. This includes a set of ten Generally Accepted Auditing Standards, the second of which addresses "independence." See Codification of Statements on Auditing Standards, Statement on Auditing Standards No. 1, § 150 at 21 (AICPA 1995) (hereinafter "Auditing Standards "). AICPA's official interpretation of this standard requires that the auditor be "in public practice (as distinct from being in private practice)," and states in part:
 
 
 24
 It is of utmost importance to the profession that the general public maintain confidence in the independence of independent auditors. Public confidence would be impaired by evidence that independence was actually lacking, and it might also be impaired by the existence of circumstances which reasonable people might believe likely to influence independence. To be independent, the auditor must be intellectually honest; to be recognized as independent, he must be free from any obligation to or interest in the client, its management, or its owners.... Independent auditors should not only be independent in fact; they should avoid situations that might lead outsiders to doubt their independence.
 
 
 25
 Auditing Standards, Statement on Auditing Standards No. 1, § 220 at 31.[5] The Securities and Exchange Commission has also adopted a regulation setting forth the necessary qualifications of an accountant issuing a report on the financial statement of a publicly traded company. That regulation's independence requirement bars an accountant from auditing a firm or its affiliates if that firm has employed him or anyone else from his office during the period covered by his report. 17 C.F.R. § 210.2-01 (1996). Based on these authorities, we think that it is unlikely that an arrangement like that at issue in California Saw would be consistent with the ordinary norms for the independence of an audit.
 
 
 26
 2. "Auditor"
 
 
 27
 The most prevalent category of professional qualification in the accounting profession is a license to practice as a certified public accountant, or CPA. "Some states have additional categories of accounting practitioners, such as public accountants or registered accountants, who are not certified but who are otherwise licensed to offer certain types of services to the general public." D. Edward Martin, Attorney's Handbook of Accounting, Auditing and Financial Reporting § 1.01 at 1-4 (1996). Federal law permits audits of employee benefit plans and publicly traded firms to be performed either by certified public accountants or by licensed public accountants.[6] Audits of unions should in general conform to a similar standard.
 
 
 28
 Ferriso asserts that Hudson should be read to require that all audits be performed by CPAs. Hudson did say, in discussing whether the contributions of nonmembers must be escrowed in full while a challenge to an agency fee is pending, that "[i]f, for example, the original disclosure by the Union had included a certified public accountant's verified breakdown of expenditures, including some categories that no dissenter could reasonably challenge, there would be no reason to escrow" fees in these categories. 475 U.S. at 310, 106 S.Ct. at 1077. The context makes clear, however, that this reference to a certified public accountant was intended as an example, and that it is the term "independent auditor" that governs.[7]III. CONCLUSION
 
 
 29
 For the foregoing reasons, we grant Ferriso's petition for review, and remand this cause to the NLRB for further proceedings consistent with this opinion. On remand, the NLRB shall order that the Unions provide Ferriso with an independent audit of their financial data, and that the independence and qualifications of the auditors conform to prevailing norms for audits of comparable entities.
 
 
 30
 So ordered.
 
 
 
 [1]
 The Board's decision in the present case said that the standards of California Saw would apply to whatever verification arrangement the Unions adopted. See IUE, 322 N.L.R.B. No. 1 at 2 n. 7 ("We note, however, that under California Saw the Board will examine whether a union's method of verifying its calculations satisfies the union's duty of fair representation.")
 
 
 [2]
 In what seems to have been an error, California Saw also cited in support of its reading of the LMRDA's legislative history a portion of the LMRDA Conference Report that addressed a minor, unrelated change made by the conference committee. See H.R. CONF. REP. NO. 86-1147 at 31-32 (1959), reprinted in 1 Leg. Hist. at 935-36 (1959). The Board has not attempted to explain this citation
 
 
 [3]
 Indeed, although California Saw rejected the "independent auditor" formula, it also seemed to conclude, somewhat confusingly, that the auditors in the arrangement before it qualified as "independent," saying, for instance, that "[w]e do not accept the premise advanced by the General Counsel that the independence necessary to prepare verification-of-expense audits of District and Local Lodges consistent with a union's obligations under Beck can never be assured when there is an employer-employee relationship between the auditors and the [union]." 320 N.L.R.B. at 241. It is therefore possible that the Board may view California Saw as having some weight as to the meaning of the term "independent."
 
 
 [4]
 A "comparable" entity is one that, because of its size and the nature of its activities, presents an auditing task that is similar in difficulty and scope to the task at hand (which will in some cases be an audit of a single union, and in others an audit of a union and its affiliates)
 
 
 [5]
 The AICPA has also adopted a Code of Professional Conduct, of which the first rule, Rule 101, is Independence. See Code of Professional Conduct, reprinted in Larry P. Bailey, GAAS Guide at 44.05 (1995); see also id. at 44.08--44.20 (reprinting official AICPA interpretations of this rule)
 
 
 [6]
 See 17 C.F.R. § 210.2-01 (referring to "certified public accountants" and "public accountants"); 29 U.S.C. § 1023(a)(3)(D) (defining a "qualified public accountant" permitted to audit an employee benefit plan to mean: "(i) a person who is a certified public accountant, certified by a regulatory authority of a State; (ii) a person who is a licensed public accountant, licensed by a regulatory authority of a State; or (iii) a person certified by the Secretary ... for a person who practices in States where there is no certification or licensing procedure for accountants")
 
 
 [7]
 A review of the briefs of the parties in Hudson confirms this conclusion. Neither party referred to a "certified public accountant" in its brief. The brief of the Chicago Teachers Union did, however, discuss the possibility that a union could avoid the need to escrow the full agency fees of objectors pending a challenge if it escrowed the maximum amount that could conceivably be in dispute, and asserted that "the risk of miscalculation [of this sum] can also be minimized if a union retains a neutral (such as an independent auditor or impartial labor arbitrator) to make the calculations." Brief for the Chicago Teachers Union at 27 n.19, Hudson (No.84-1503)
 The Court's decision only to approve the use of an "independent auditor," and not an "impartial labor arbitrator," suggests that the Court believed that some professional qualifications were required to perform an audit. In failing to approve the use of an "impartial labor arbitrator," the Court seemingly declined to approve a procedure that was already in use by the National Education Association ("NEA"), and that was described in great detail in a brief that the NEA filed as an amicus. The NEA's procedure relied on a calculation made by an arbitrator with "experience in public sector labor relations," but not necessarily in accounting. See Brief for the NEA as Amicus Curiae in Support of Petitioners at 10-17, Hudson, (No. 84-1503).