# AIR LINE PILOTS ASSOCIATION *v.* MILLER ET AL.

No. 97–428.   Argued March 23, 1998—Decided May 26, 1998

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. BREYER, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 880.

*Jerry D. Anker* argued the cause and filed briefs for petitioner.

*Raymond J. LaJeunesse, Jr.,* argued the cause for respondents. With him on the brief was *Philip F. Hudock.**

JUSTICE GINSBURG delivered the opinion of the Court.

An "agency-shop" arrangement permits a union, obliged to act on behalf of all employees in the bargaining unit, to charge nonunion workers their fair share of the costs of the representation. The purposes for which a union may spend the "agency fee" paid by nonmembers, however, are circumscribed by the First Amendment (when public employers are involved) and the National Labor Relations Act (NLRA) or Railway Labor Act (RLA) (when private employers subject to their provisions are involved). In *Teachers* v. *Hudson,* 475 U. S. 292 (1986), we held that the First Amendment requires public-employee unions to accord workers who object

---

*Briefs of *amici curiae* urging reversal were filed for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, James B. Coppess,* and *Laurence Gold;* and for the National Education Association by *Robert H. Chanin* and *Jeremiah A. Collins.*

*Frank T. Mamat, J. Walker Henry,* and *George M. Mesrey* filed a brief for the Mackinac Center for Public Policy as *amicus curiae* urging affirmance.

to the agency fee "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker." *Id.*, at 310.

Petitioner Air Line Pilots Association (ALPA or Union), a private-sector labor organization covered by the RLA, acknowledges that it is bound by *Hudson*. ALPA endeavored to comply with *Hudson*'s "impartial decisionmaker" requirement by referring all fee disputes to a neutral arbitrator. In the action now before us, nonunion pilots challenged the agency fee collected by the Union in 1992. ALPA urged that the challengers must exhaust the arbitration process before pursuing judicial remedies. The Court of Appeals for the District of Columbia Circuit held that the pilots resisting the agency fee may proceed at once in federal court. We hold, in accord with the Court of Appeals, that employees need not submit fee disputes to arbitration when they have never agreed to do so.

I

ALPA represents, as exclusive bargaining agent, pilots employed by most United States commercial air carriers, including Delta Air Lines (Delta). In November 1991, ALPA and Delta amended their collective-bargaining agreement to include, *inter alia*, an "agency-shop" clause. That clause, similar to provisions in ALPA's agreements with other carriers, required each pilot who was not an ALPA member to pay the Union a monthly "service charge as a contribution for the administration of [the collective-bargaining agreement] and the representation of such employee." App. 31.

On December 12, 1991, five Delta pilots filed this action against ALPA and Delta in the District Court for the District of Columbia. Their complaint charged that the "agency-shop" clause was unlawful on its face. (Three of the original plaintiffs, plus 150 Delta pilots who subsequently intervened, are respondents here; the other two original plaintiffs were dismissed from the case for reasons unrelated to the issue we resolve. Delta was also dismissed from the

case on grounds not pertinent here.) The pilots unsuccessfully moved for a preliminary injunction against implementation of the agency-shop arrangement, and ALPA began collecting agency fees on January 1, 1992.

In 1992, ALPA charged its members monthly dues of 2.35 percent of each pilot's earnings. The Union ultimately determined, in its final, audited "Statement of Germane and Nongermane Expenses" (SGNE) for 1992, that 19 percent of ALPA's expenses for that year were not germane to collective bargaining. Accordingly, the Union adjusted fees charged nonmembers to equal 81 percent of the amount members paid.

On October 8, 1992, some months after the Union had begun to collect agency fees, the pilots moved to amend their complaint to add a count challenging the manner in which ALPA calculated the fee. They alleged, *inter alia,* that ALPA had overstated the percentage of its expenditures genuinely attributable to "germane" activities. The District Court granted the motion to amend on August 2, 1993. The pilots' original facial challenges to the agency-shop clause were later resolved in the Union's favor on summary judgment (a matter the pilots did not contest on appeal). Thus, the challenge to the 1992 agency-fee calculation is the only claim before us.

Under ALPA's "Policies and Procedures Applicable to Agency Fees," pilots who object to the fee calculation may request arbitration under procedures the American Arbitration Association (AAA) devised to resolve such disputes. *Id.,* at 69–70. One hundred seventy-four Delta pilots filed timely objections with the Union after receiving the 1992 SGNE. ALPA treated those objections as requests for arbitration and referred them to the AAA. On October 15, 1993, the AAA appointed an arbitrator to resolve the objections in a single, consolidated proceeding.

The objectors included 91 of the 153 pilots who are respondents here. (The other 62 respondents intervened in

the lawsuit but were not parties to the arbitration.) Preferring to pursue their challenges to ALPA's agency-fee calculation in the context of their ongoing federal-court action, the respondent-objectors asked the AAA to suspend the arbitration. The AAA referred that request to the arbitrator, who declined to defer to the federal-court litigation. *Id.*, at 106. After the District Court denied a motion to enjoin the arbitration, *id.*, at 111–114, respondents' counsel entered a "conditional appearance" in the arbitral proceedings. The arbitrator held hearings in January, February, and March 1994. He ultimately sustained the Union's agency-fee calculation in substantial part, although he concluded that "nongermane" expenses made up 21.49 percent of the union's budget, not 19 percent as the Union had determined. App. to Pet. for Cert. 71a–115a, 158a–161a.

After the arbitrator issued his decision, ALPA moved for summary judgment in the federal-court action. Granting the motion, the District Court concluded that pilots seeking to challenge the Union's agency-fee calculation must exhaust arbitral remedies before proceeding in court. *Id.*, at 26a–31a. Accordingly, the court held, the 62 respondents who did not join the arbitration were bound by the arbitrator's decision. *Id.*, at 32a. The other 91 respondents, the District Court ruled, qualified for clear-error review of the arbitrator's factfindings and *de novo* review of all legal issues. *Id.*, at 31a. Determining that the arbitrator had committed no error of law or clear error of fact, the court sustained his decision.

The Court of Appeals for the District of Columbia Circuit reversed. 108 F. 3d 1415 (1997). That court found "no legal basis" for requiring objectors to arbitrate agency-fee challenges unless they had agreed to do so (as respondents had not). *Id.*, at 1421 (emphasis deleted). It therefore concluded that "the arbitrator's decision [was] no longer a part of the legal picture," and for that reason the case "must be remanded." *Id.*, at 1422. We granted certiorari, 522 U. S.

991 (1997), limited to the question whether an objector must exhaust a union-provided arbitration process before bringing an agency-fee challenge in federal court, a matter on which the Courts of Appeals have reached differing conclusions.[1]

## II

### A

Because Delta is a "common carrier by air engaged in interstate or foreign commerce," 45 U. S. C. § 181, the RLA governs its bargaining relationship with ALPA. Section 2, Eleventh, of the RLA allows employers and unions to conclude agency-shop agreements.[2] The statutory authorization for such agreements aims to resolve the problem of "free riders—employees in the bargaining unit on whose behalf

---

[1] Compare *Lancaster* v. *Air Line Pilots Assn. Int'l,* 76 F. 3d 1509, 1522 (CA10 1996) (exhaustion of arbitral remedy required), with *Knight* v. *Kenai Peninsula Borough School Dist.,* 131 F. 3d 807, 816 (CA9 1997) (exhaustion not required), and *Bromley* v. *Michigan Ed. Assn.-NEA,* 82 F. 3d 686, 694 (CA6 1996) (same).

[2] The RLA, § 2, Eleventh, as added by 64 Stat. 1238, 45 U. S. C. § 152, Eleventh, provides in pertinent part:

"Notwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided,* That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required *as a condition of acquiring or retaining membership.*"

the union [is] obliged to perform its statutory functions, but who refus[e] to contribute to the cost thereof." *Ellis* v. *Railway Clerks*, 466 U. S. 435, 447 (1984). Under agency-shop arrangements, nonmembers must pay their fair share of union expenditures "necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." *Id.*, at 448. To avoid constitutional questions that might arise were we to adopt a contrary interpretation of the RLA, however, we have held that costs unrelated to those representative duties may not be imposed on objecting employees. See *id.*, at 448–455; see also *Railway Clerks* v. *Allen*, 373 U. S. 113, 121 (1963) (§ 2, Eleventh, distinguishes between "the union's political expenditures," to which nonmembers may not be compelled to contribute, and expenditures "germane to collective bargaining," to which they may); *Machinists* v. *Street*, 367 U. S. 740, 768–769 (1961) ("§ 2, Eleventh is to be construed to deny the unions, over an employee's objection, the power to use his exacted funds to support political causes which he opposes"); see also *Communications Workers* v. *Beck*, 487 U. S. 735, 762–763 (1988) (same limitations apply under NLRA).

A similar rule—based explicitly on the Constitution—applies to public-sector employment. In *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209, 232 (1977), we upheld the constitutionality of agency-shop agreements made by government employers with their workers' exclusive bargaining representatives. As the Court explained, imposition of agency fees under the RLA "is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress," and "[t]he same important government interests . . . presumptively support" agency-shop arrangements in the public sector. *Id.*, at 222, 225.

The agency fees assessed from nonmembers, we said in *Abood*, may be "used to finance expenditures by the Union

for the purposes of collective bargaining, contract adminis-tration, and grievance adjustment." *Id.*, at 225–226. We cautioned, however, in view of the presence of state action, that objecting employees have a First Amendment right to "prevent the Union's spending a part of their required serv-ice fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative." *Id.*, at 234. In *Lehnert* v. *Ferris Faculty Assn.*, 500 U. S. 507, 519 (1991), we relied on both public-sector and RLA cases to hold that agency fees assessed by public-employee unions "must (1) be 'germane' to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop."

In *Hudson*, a public-sector case, we held that the First Amendment required unions and employers to provide pro-cedural protections for nonunion workers who object to the calculation of the agency fee. Three safeguards, we de-clared, are essential to "minimize the infringement" on non-members' rights and provide workers with "a fair opportu-nity to identify the impact of [the agency-fee assessment] on [their] interests," *Hudson*, 475 U. S., at 303: Employees must receive "sufficient information to gauge the propriety of the union's fee," *id.*, at 306; the union must give objectors "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker," *id.*, at 310; and any amount of the objector's fee "reasonably in dispute" must be held in escrow while the challenge is pending, *ibid.*

### B

The Court of Appeals held that *Hudson*'s procedural re-quirements transfer fully to employment relations governed by the RLA, 108 F. 3d, at 1419, and the parties have not

challenged that determination.[3]   We therefore turn directly to the question presented: When a union adopts an arbitration process to comply with *Hudson*'s "impartial decision-maker" requirement, must agency-fee objectors pursue and exhaust the arbitral remedy before challenging the union's calculation in a federal-court action?

In his concurring opinion in *Hudson*, Justice White (joined by Chief Justice Burger) answered that question "yes."   He stated: "[I]f the union provides for arbitration and complies with the other requirements specified in our opinion, it should be entitled to insist that the arbitration procedure be exhausted before resorting to the courts."   475 U. S., at 311. The Court's opinion did not comment on that unelaborated assertion, however, so the issue remains live for the decision we now reach.   The Court of Appeals recognized that "Justice White raised a legitimate *practical* concern," but found "no *legal* basis for forcing into arbitration a party who never agreed to put his dispute over federal law to such a process." 108 F. 3d, at 1421 (emphasis in original).   We agree, and decline to read *Hudson* as a decision that protects nonunion members at a cost—delayed access to federal court—they do not wish to pay.

ALPA urges extension of the discretionary exhaustion-of-remedies doctrine to agency-fee arbitration.   See Brief for Petitioner 19 (citing *McCarthy* v. *Madigan*, 503 U. S. 140, 144 (1992) ("[W]here Congress has not clearly required exhaus-

---

[3] See *Lehnert* v. *Ferris Faculty Assn.*, 500 U. S. 507, 516 (1991) ("[T]he RLA cases necessarily provide some guidance regarding what the First Amendment will countenance in the realm of union support of political activities through mandatory assessments."); *id.*, at 555 (SCALIA, J., concurring in judgment in part and dissenting in part) ("good reason to treat" statutory agency-fee cases as reflecting First Amendment principles articulated in *Abood*).   But cf. *Price* v. *International Union, UAW*, 927 F. 2d 88, 92 (CA2 1991) (*Hudson*'s "heightened procedural safeguards" do not apply to agency-fee cases involving private employers governed by the NLRA).

tion, sound judicial discretion governs."")).[4]   But a principal purpose of that doctrine is not relevant here.  "[T]he exhaustion doctrine recognizes the notion, grounded in deference to Congress' delegation of authority to coordinate branches of Government, that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer."  *Id.*, at 145.   ALPA seeks exhaustion not of an administrative remedy established by Congress but of an arbitral remedy established by a private party.  Ordinarily, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *Steelworkers* v. *Warrior & Gulf Nav. Co.*, 363 U. S. 574, 582 (1960); see also *First Options of Chicago, Inc.* v. *Kaplan*, 514 U. S. 938, 942 (1995) ("a party who has not agreed to arbitrate will normally have a right to a court's decision about the merits of its dispute").

The Union, it is true, acted to comply with this Court's decision in *Hudson* rather than out of its own unconstrained choice.  But *Hudson*'s requirement of "a reasonably prompt

---

[4] *Amicus* National Education Association (NEA) argues that the question before us is one not of exhaustion but of ripeness.  Illegality depends on the *spending* of compelled agency fees for ideological purposes, NEA maintains, not simply the initial collection of those fees; hence, an objector has no basis for filing suit until the arbitrator has ruled and the disputed amounts are released from escrow.  See Brief for National Education Association as *Amicus Curiae* 18–20.  Petitioner, in its reply brief, endorses NEA's argument.  See Reply Brief 16–17.  The contention, however, is inconsistent with *Teachers* v. *Hudson*, 475 U. S. 292 (1986).  There, we rejected the union's position that "because a 100% escrow completely avoids the risk that dissenters' contributions could be used improperly, it eliminates any valid constitutional objection to the procedure and thereby provides an adequate remedy."  *Id.*, at 309.  We held that even if the entire agency fee remained in escrow throughout arbitration, objectors (who are deprived of the use of what may be their property pending the outcome of the dispute) had an independent, enforceable interest in the prompt and proper resolution of their objections.

decision by an impartial decisionmaker," 475 U. S., at 307, aims to protect the interest of objectors by affording them access to a neutral forum in which their objections can be resolved swiftly; nothing in our decision purports to compel objectors to pursue that remedy. See *ibid.* ("The nonunion employee, whose First Amendment rights are affected by the agency shop itself and who bears the burden of objecting, is entitled to have his objections addressed in an expeditious, fair, and objective manner."). Indeed, *Hudson*'s emphasis on the need for a speedy remedy weighs against exhaustion, even through an arbitration procedure intended to be expeditious, as an essential prerequisite to federal-court consideration of nonmember challenges. See *McCarthy*, 503 U. S., at 146 ("[A]dministrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." (internal quotation marks omitted)). We resist reading *Hudson* in a manner that might frustrate its very purpose, to advance the swift, fair, and final settlement of objectors' rights.

Against these concerns, ALPA stresses the asserted efficiency gains of requiring objectors to proceed to arbitration first. The Union asserts: "It is difficult to conceive how a court could fairly try an agency-fee dispute *ab initio*, given that the plaintiffs who challenge an agency-fee calculation are not required to state any grounds whatsoever for their challenge." Reply Brief 6–7. Arbitration, in ALPA's view, will serve a useful, if not essential, role in defining the scope of the dispute. See Brief for Petitioner 21–23; Reply Brief 4–7.

ALPA overstates the difficulties of holding a federal-court hearing without a preparatory arbitration. We have held that "the nonunion employee has the burden of raising an objection, but that the union retains the burden of proof."

*Hudson,* 475 U. S., at 306.   And when pursuing the union's *internal* remedies, an objector may preserve the right to subsequent judicial relief without "indicat[ing] to the Union the *specific* expenditures to which he objects." *Abood,* 431 U. S., at 241 (emphasis in original).   In stating that the "nonmember's 'burden' is simply the obligation to make his objection known," *Hudson,* 475 U. S., at 306, n. 16, however, we did not hold that a federal-court plaintiff can file a generally phrased complaint, then sit back and require the union to prove the "germaneness" of its expenditures without a clue as to "which of its thousands of expenditures" the objectors oppose.   Reply Brief 4.   Agency-fee challengers, like all other civil litigants, must make their objections known with the degree of specificity appropriate at each stage of litigation their case reaches: motion to dismiss; motion for summary judgment; pretrial conference.

The very purpose of *Hudson's* notice requirement is to provide employees sufficient information to enable them to identify the expenditures that, in their view, the union has improperly classified as germane.   See 475 U. S., at 306–307. With the *Hudson* notice, plus any additional information developed through reasonable discovery, an objector can be expected to point to the expenditures or classes of expenditures he or she finds questionable.   Although the union must establish that those expenditures were in fact germane, the shifted burden of proof provides no warrant for blocking dissenting employees from bringing their claims in federal court in the first instance, if that is their preference.   The answer to ALPA's efficiency concern lies in conscientious management of the pretrial process to guard against abuse, not in a judicially imposed exhaustion requirement.

Moreover, the degree to which an exhaustion requirement would reduce the burden on the courts is uncertain.   To the extent that the arbitrator does not sustain an objection to the union's fee calculation, exhaustion would require the ob-

jector to traverse two layers of procedure rather than one.[5] Furthermore, if the union's arbitration process in fact operates to provide an inexpensive, swift, and sure remedy for agency-fee errors, dissenting employees may avail themselves of that process even if not required to do so. Cf. *Patsy* v. *Board of Regents of Fla.*, 457 U. S. 496, 513, n. 15 (1982) (under a "'free market' system" of no required exhaustion, "litigants are free to pursue administrative remedies if they truly appear to be cheaper, more efficient, and more effective").

The Union may, nonetheless, face the prospect of defending its fee calculation simultaneously in judicial and arbitral fora. We note that unions do not lack means to limit the expense and disruption occasioned by multiple fee challenges: objections may be consolidated for consideration in a single arbitration, for example, and agency-fee litigation may be consolidated in a single district court. See 28 U. S. C. §§ 1404, 1407. But genuine as the Union's interest in avoiding multiple proceedings may be, that interest does not overwhelm objectors' resistance to arbitration to which they did not consent, and their election to proceed immediately to court for adjudication of their federal rights.[6] We hold that, unless they agree to the procedure, agency-fee objectors may

---

[5] Inevitably limiting the utility of exhaustion in relieving the courts of the task of adjudicating agency-fee disputes is the nonbinding character of *Hudson* arbitration, a characteristic on which the dissent centrally relies. See *post*, at 880, 881, 882, 883–885.

[6] Our recognition of the right of objectors to proceed directly to court does not detract from district courts' discretion to defer discovery or other proceedings pending the prompt conclusion of arbitration. See, *e. g., Landis* v. *North American Co.*, 299 U. S. 248, 254–255 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.").

not be required to exhaust an arbitration remedy before bringing their claims in federal court.

\* \* \*

For the reasons stated, the judgment of the Court of Appeals for the District of Columbia Circuit is

*Affirmed.*

JUSTICE BREYER, with whom JUSTICE STEVENS joins, dissenting.

In *Teachers* v. *Hudson,* 475 U. S. 292 (1986), this Court held that

> "the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, *a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker,* and an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.,* at 310 (emphasis added).

The Court added that, if the "impartial decisionmaker" is an arbitrator, that arbitrator's decision would not bind a court in a subsequent court action. *Id.,* at 308, n. 21 ("arbitrator's decision would not receive preclusive effect in any subsequent § 1983 action"). Cf. *ante,* at 874–875, and n. 3 (treating procedural requirements set forth in *Hudson,* a 42 U. S. C. § 1983 case, as "transfer[ing] fully" to Railway Labor Act cases such as this one).

I read *Hudson* as implying approval, not disapproval, of a union rule that would require initial participation in "prompt," but *non*-binding, arbitration. Indeed, Justice White, joined by Chief Justice Burger, concurring in the Court's judgment and opinion in *Hudson,* specifically stated that

> "if the union provides for arbitration and complies with the other requirements specified in our opinion, it should

be entitled to insist that the arbitration procedure be exhausted before resorting to the courts." 475 U. S., at 311.

I agree with Justice White that the law permits the Union to insist upon compliance with that internal procedure—as long as the required arbitration is nonbinding and conducted expeditiously by an "impartial" arbitrator, as *Hudson* requires. *Id.,* at 310.

The Court majority quotes with approval the Court of Appeals' statement that Justice White's concern, while "'practical,'" lacked a "'legal basis.'" *Ante,* at 875 (quoting 108 F. 3d 1415, 1421 (CADC 1997)) (emphasis deleted). But *Hudson* itself, and the case law upon which *Hudson* rests, provide more than adequate legal support for Justice White's basic position. Those cases make clear that *Hudson's* requirements do not rest solely upon the interests of dissenting employees, but, rather, grow out of a judicial effort to balance two distinct interests.

One interest is the Union's concern that nonmember employees share the cost of the collective bargaining from which they benefit. See *Abood* v. *Detroit Bd. of Ed.,* 431 U. S. 209, 222 (1977) (imposition of agency fees "is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress"); *Railway Clerks* v. *Allen,* 373 U. S. 113, 122 (1963) ("no decree would be proper which appeared likely to infringe the unions' right to expend uniform exactions under the union-shop agreement"); *Machinists* v. *Street,* 367 U. S. 740, 761–764 (1961); see also *Lehnert* v. *Ferris Faculty Assn.,* 500 U. S. 507, 520–521 (1991). The other interest is that of the nonmember in *not* paying for "nongermane" union activity, which activity may promote ideological or political views that the nonmember does not share. *Lehnert, supra,* at 515–519; *Abood, supra,* at 233–236; *Allen, supra,* at 118–121; *Street, supra,* at 765–769.

This Court has interpreted the relevant labor statutes, in light of the Constitution's requirements, as requiring procedures that "protect *both*" these "interests to the maximum extent possible without undue impingement of one on the other." *Street, supra*, at 773 (emphasis added). Indeed, *Hudson* itself makes clear that procedural requirements "'must'" seek as their "'objective'" to "'preven[t] compulsory subsidization of ideological activity by employees who object thereto *without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities.'*" 475 U. S., at 302 (quoting *Abood, supra*, at 237) (emphasis added). The mandatory, but non-binding, arbitration requirement at issue here satisfies these objectives, for it amounts to a reasonable elaboration of *Hudson*'s own mandate: that the Union provide "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker." 475 U. S., at 310.

First, consider the matter from the Union's perspective. The "arbitration first" requirement seems reasonable because it lowers the costs of resolving agency fee disputes and makes their resolution manageable. As this case illustrates, different groups of nonmember dissenters with different motivations for objecting may proceed in different forums. Without the "arbitration first" rule, they might do so simultaneously. Judge and arbitrator, perhaps subject to different discovery requests, obtaining somewhat different information, hearing different arguments, operating under different rules of procedure and evidence, and exercising different judgments (each without knowledge of the other), could well determine differently costs and complex expenditure relationships, thereby reaching different, even conflicting, conclusions. *Amicus* National Education Association says that this "would be the most expensive and burdensome system imaginable." Brief for National Education Association as *Amicus Curiae* 14. *Amicus* AFL–CIO adds that the "costs of defending such litigation" (which may involve no

more than $50 or so for any individual dissenter, see Tr. of Oral Arg. 10) "can easily consume the union's agency fee receipts." Brief for AFL–CIO as *Amicus Curiae* 14, n. 5. The Court itself recognizes as "[g]enuine" the Union's "concern" about defending "its fee calculation simultaneously in judicial and arbitral fora." *Ante,* at 878, 879.

Second, consider the matter from the perspective of the dissenting employee. The Court's decision, rejecting the Union's rule, may help to protect the ideological interests of a few of those employees, but only a few, and then in a way that does *not* offset the corresponding harm caused the Union. That is because "arbitration first" does not mean serious delay, for the arbitration must begin promptly and proceed expeditiously. See *Hudson, supra,* at 307. Moreover, nonbinding arbitration may resolve the dispute to the satisfaction of some dissenting employees, perhaps those whose objections rest less upon ideology and more upon a desire to minimize the fee they must pay. See *Gilpin* v. *AFSCME,* 875 F. 2d 1310, 1313 (CA7 1989) (noting that many objectors are "free riders" seeking representation at the lowest cost possible); *Weaver* v. *University of Cincinnati,* 970 F. 2d 1523, 1530 (CA6 1992) (same); *Kidwell* v. *Transportation Comm. Int'l Union,* 946 F. 2d 283, 304–306 (CA4 1991) (same).

Nor will trying arbitration first prejudice the cause of the remaining unsatisfied objectors. The nonbinding arbitration process may deprive objectors of their money for a brief additional time, but the disputed fees must remain unspent in escrow during the arbitration proceedings. *Hudson, supra,* at 305, 310. Nonbinding arbitration also leaves the objectors free to press their claims in a later court action— if the arbitration's result leaves them dissatisfied. And, as the Union conceded at oral argument, the judge in that later action, though informed by the arbitrator's decision, would not accord it any special legal weight. Tr. of Oral Arg. 16, 20–21; see also *Hudson, supra,* at 308, n. 21 ("arbitrator's decision would not receive preclusive effect in any subse-

quent § 1983 action"). Cf. *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944) (administrative agency, through its interpretations, may have the "power to persuade, if lacking power to control"). In other words, the objecting dissenter, though briefly delayed, could proceed in court and on a clean slate. See Hensler, Court-Ordered Arbitration: An Alternative View, U. Chi. Legal Forum 399, 401 (1990) (describing differences between mandatory *non*-binding arbitration over agency fee calculations, and traditional mandatory *binding* arbitration).

From the courts' perspective too, nonbinding arbitration can prove helpful. Insofar as it settles matters to the parties' satisfaction, it avoids unnecessary, perhaps time-consuming, judicial investigation of highly complex union accounts and expense allocations. Cf. *Allen*, 373 U. S., at 122 (describing difficulties surrounding "judicially administered relief" for agency fee objectors, as compared with "internal union remedy"); *Abood*, 431 U. S., at 240 (same).

The upshot is that the "arbitration first" rule "prevent[s] compulsory subsidization of ideological activity" without unduly "restricting the Union's ability" to collect a legitimate agency fee. Consequently, neither the First Amendment, nor any statute, as interpreted by this Court, prohibits the Union's insistence upon that rule.

I fear that the majority is led to a different conclusion through use of analogies that, in my view, do not govern the circumstances before us. First, the Court analogizes the arbitration at issue here to binding arbitration often found in contracts, including labor contracts, where arbitration is legally anchored in the consent of the parties. *Ante*, at 876. But "consent" is not relevant to the legal justification for the "arbitration first" rule before us. Rather, that rule finds its legal anchor in the Union's legal authority (indeed, obligation) under *Hudson* to impose internal procedures that permit collection of agency fees, without undue infringement of objectors' constitutional rights. I have explained above

why the rule at issue here satisfies *Hudson*'s requirements. If one needs an analogy, I would find it, not in consensual arbitration, but in court rules that require parties to try nonbinding arbitration before they pursue a case in court. See, *e. g.*, 28 U. S. C. §§ 651–658 (authorizing district courts to refer certain types of civil actions to arbitration); Alternative Dispute Resolution, Local Rules 2–3, 4–2 (ND Cal. 1998); see also B. Meierhoefer, Federal Judicial Center, Court-Annexed Arbitration in Ten District Courts (1990).

Second, the Court describes the Union's proposed "arbitration first" rule as an "extension of the discretionary exhaustion-of-remedies doctrine." *Ante*, at 875. But whether that particular doctrine offers legal justification in this case is beside the point. The "arbitration first" rule amounts to an elaboration of the obligations set forth in *Hudson*. Those obligations rested upon the substantive law that permits collection of agency fees interpreted in light of the competing demands of the First Amendment. *Hudson* decided that this law required the courts to craft a mandatory, nonbinding mechanism for speedy dispute resolution. Exhaustion principles did not prevent the Court from doing so. Why then should those principles prevent the Court from elaborating upon *Hudson*'s requirements, by permitting a union to impose a reasonable "arbitration first" rule of the kind before us?

I note one additional matter. The Court's opinion refers to the "pilots . . . proceed[ing] at once in federal court." *Ante*, at 869. The Court does not decide, however, whether a federal court can await the conclusion of an expeditious arbitration before it proceeds, for example, with discovery. *Ante*, at 879, n. 6. Should it await arbitration's conclusion, the court would be able to take advantage of any settlement or narrowing of issues that the nonmandatory arbitration proceeding produced. Doing so would alleviate many of the concerns that I have expressed in this opinion. See *supra*, at 882–884.

Even so, the question before us is whether the Union can insist upon prior recourse to that form of arbitration. For the reasons stated, I believe such a requirement is consistent with, and a reasonable extension of, this Court's decision in *Hudson*.

I therefore dissent.