# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 2, 2021

Lyle W. Cayce
Clerk

No. 20-30086

RANDY BOUDREAUX,

*Plaintiff—Appellant*,

*versus*

LOUISIANA STATE BAR ASSOCIATION, *a Louisiana Nonprofit Corporation*; LOUISIANA SUPREME COURT; BERNETTE J. JOHNSON, *Chief Justice of the Louisiana Supreme Court*; SCOTT J. CRICHTON, *Associate Justice of the Louisiana Supreme Court for the Second District*; JAMES T. GENOVESE, *Associate Justice of the Louisiana Supreme Court for the Third District*; MARCUS R. CLARK, *Associate Justice of the Louisiana Supreme Court for the Fourth District*; JEFFERSON D. HUGHES, III, *Associate Justice of the Louisiana Supreme Court for the Fifth District*; JOHN L. WEIMER, *Associate Justice of the Louisiana Supreme Court for the Sixth District*; UNIDENTIFIED PARTY, *Successor to the Honorable Greg Guidry as Associate Justice of the Louisiana Supreme Court for the First District*,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-CV-11962

---

Before SMITH, WILLETT, and DUNCAN, *Circuit Judges*.

DON R. WILLETT, *Circuit Judge*:

No. 20-30086

After the COVID–19 pandemic threw the rite-of-passage bar exam into turmoil, states adopted a hodgepodge of responses that teed up larger questions, like "Is the bar exam the best way to measure competency?" and "[A]re there ways to fundamentally change how lawyers are trained, licensed, and regulated?"[1] The exam is being reexamined. But for most lawyers, the bar examination is just step one of a career-long relationship with the bar association. Even if the legal licensing regime is lastingly upended, thirty or so states still mandate joining and funding the state bar as a precondition to practicing law.

This First Amendment case, one of several "bar wars" lawsuits across the country, challenges Louisiana law that forces lawyers to join and pay annual dues to the Louisiana State Bar Association (LSBA).[2] Louisiana attorney Randy Boudreaux objects to many of LSBA's activities, which he labels political and ideological advocacy. He claims that compelled dues and membership violate his First Amendment rights, as does LSBA's failure to ensure that his dues are not used to fund the bar's political and ideological activities. The district court dismissed all of Boudreaux's claims. We reverse.

I

A

The Louisiana Supreme Court established the Louisiana State Bar Association (LSBA) in 1941 at the direction of the state legislature.[3] LSBA

---

[1] Letter from Michigan Supreme Court Chief Justice Bridget Mary McCormack to Michigan Bar Examinees (July 29, 2020).

[2] A companion case decided today concerns mandatory membership and fees in Texas. *See McDonald v. Longley*, No. 20-50448, ___ F.3d ___ (5th Cir. 2021).

[3] La. Rev. Stat. § 37:211; *In re Mundy*, 11 So. 2d 398, 400 (La. 1942) (explaining history of LSBA); *Lewis v. La. State Bar Ass'n*, 792 F.2d 493, 495 (5th Cir. 1986) (same).

is a "mandatory" or "integrated" bar, meaning attorneys must join to practice law in Louisiana.[4] To remain in good standing, attorneys must pay mandatory membership dues.[5] Currently, annual dues are $80 for attorneys in their first 3 years of membership, and $200 after that.[6] Attorneys who fail to pay their dues are subject to discipline by the Louisiana Supreme Court.[7]

LSBA's purposes are "to regulate the practice of law, advance the science of jurisprudence, promote the administration of justice, uphold the honor of the Courts and of the profession of law, encourage cordial intercourse among its members, and, generally, to promote the welfare of the profession in the State."[8] To those ends, LSBA administers the state's continuing legal education program, maintains a standing committee on the Rules of Professional Conduct, operates subject-matter "sections" devoted to different areas of the law, provides a mediation and arbitration service to resolve disputes between attorneys and clients, and sponsors the Judges and Lawyers Assistance Program to aid members of the profession struggling with substance abuse and mental health.

LSBA also conducts legislative advocacy on behalf of the legal profession. Its Legislation Committee recommends policy positions on "matters involving issues affecting the profession, the regulation of attorneys and the practice of law, the administration of justice, the availability and delivery of legal services to society, the improvement of the courts and the

---

[4] La. Rev. Stat. §§ 37:211, 37:213; La. R. Prof. Conduct § 1.1(c).

[5] La. R. Prof. Conduct § 1.1(c); LSBA Articles of Incorporation art. V, § 1; LSBA By-Laws art. I, § 4.

[6] LSBA By-Laws art. I, § 1.

[7] La. S. Ct. R. XIX.

[8] LSBA Articles of Incorporation art. III, § 1.

No. 20-30086

legal profession, and such other matters consistent with the mission and purposes of the [LSBA]."[9] However, LSBA's bylaws prohibit the Legislation Committee's involvement with "legislation which is ideological in nature, unrelated to the practice of law, or which is unnecessarily divisive."[10] From 2015 to 2019, the Legislation Committee took positions on at least 136 bills considered by the Louisiana legislature.

LSBA's bylaws require it to "timely publish notice of adoption of legislative positions in at least one of its regular communications vehicles and [to] send electronic notice of adoption of legislative positions to Association members."[11] A member who opposes any of the bar's activities for political or ideological reasons may file a written objection with LSBA's Executive Director "within forty-five (45) days of the date of the Bar's publication of notice of the activity to which the member is objecting."[12] LSBA's Board of Governors must either refund the pro rata amount of the objecting member's dues expended on the challenged activity or refer the matter to arbitration.[13]

B

Randy Boudreaux is a member of LSBA who practices law in New Orleans. He opposes the mandatory nature of the bar and claims he would not be a member but for the laws and regulations requiring it. He also opposes the use of his dues to fund political activity and legislative advocacy, and he

---

[9] LSBA By-Laws art. XI, § I.

[10] *Id.*

[11] LSBA By-Laws art. XI, § 5.

[12] LSBA By-Laws art. XII, § 1(A)(a).

[13] *Id.*

4

claims that LSBA does not provide him with adequate means to object to its political expenditures.

Boudreaux sued LSBA, the Louisiana Supreme Court, and the individual state supreme court justices under 42 U.S.C. §§ 1983 and 1988, seeking to enjoin enforcement of the rules requiring his membership in, and payment of dues to, LSBA. He claims that his First Amendment rights to free association and free speech are violated by (1) mandatory membership in LSBA, (2) the collection and use of mandatory bar dues to subsidize LSBA's speech, and, alternatively, (3) LSBA's failure to provide safeguards to ensure that his dues are not used for impermissible purposes.

Defendants moved to dismiss for lack of jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court determined that it had jurisdiction over Boudreaux's first claim, his challenge to mandatory membership in LSBA, but dismissed that claim on the merits as foreclosed by Supreme Court precedent. The court dismissed Boudreaux's second claim, his challenge to mandatory bar dues, for lack of jurisdiction after concluding that the dues are a tax for purposes of the Tax Injunction Act, which bars federal courts from hearing actions to restrain the collection of state taxes where a remedy is available in state court. The district court also dismissed Boudreaux's third claim, his challenge to LSBA's procedures for safeguarding his dues, for lack of jurisdiction, reasoning that Boudreaux lacked standing because he did not allege any impermissible expenditures.

No. 20-30086

Boudreaux timely appealed.[14] We consider Boudreaux's appeal alongside *McDonald v. Longley*, which involves similar challenges to Texas's bar.[15]

## II

We review dismissals under Rule 12(b)(1) and Rule 12(b)(6) de novo.[16] On a Rule 12(b)(1) motion, the party seeking to invoke federal jurisdiction has the burden.[17] To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[18] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[19]

## III

Before addressing Boudreaux's arguments, we detail the two Supreme Court cases that govern First Amendment challenges to state bars, *Lathrop v. Donohue*[20] and *Keller v. State Bar of California*.[21] We emphasize what those cases did decide and, more importantly for this appeal, what they did not.

---

[14] The court also determined that the Louisiana Supreme Court was not a proper defendant and dismissed it from the suit. Boudreaux does not challenge that ruling on appeal.

[15] *McDonald*, slip op. at 1, ___ F.3d at ___.

[16] *Wilson v. Houston Cmty. Coll. Sys.*, 955 F.3d 490, 494 (5th Cir. 2020), *cert. granted*, No. 20-804, ___ S. Ct. ___ (Apr. 26, 2021).

[17] *Id.*

[18] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

[19] *Id.*

[20] 367 U.S. 820 (1961).

[21] 496 U.S. 1 (1990).

*Lathrop* considered whether mandatory bar membership violates the right to free association. A plurality of the Supreme Court held that states can pursue their legitimate interests in improving the legal profession through mandatory bar membership without violating the right to free association as long as an attorney's only obligation to the bar is to pay dues.[22] When that's the case, mandatory bar membership is constitutional even though the bar "also engages in some legislative activity."[23]

*Lathrop*'s freedom of association holding is limited. First, as the plurality itself emphasized, the opinion addressed only the consequences "of compelled financial support of group activities, not with involuntary membership in any other aspect."[24] So, *Lathrop* did not consider whether an attorney's associational rights are violated by, for instance, being incorrectly perceived as agreeing with the bar when the bar takes a public stance on a topic. Second, the opinion did not specify when (if ever) a bar's legislative activity would infringe on an attorney's associational rights. The plurality either presumed that the bar's legislative activity in the case furthered a legitimate interest or concluded that the legislative activity did not alter the First Amendment analysis because it was not the bar's "major activity."[25] The opinion is unclear on that. In any event, *Lathrop* does not appear to implicate the constitutionality of a bar's political activity that is unrelated to improving the legal profession. "At bottom, *Lathrop* merely permitted states

---

[22] 367 U.S. at 843.

[23] *Id.*

[24] *Id.* at 828.

[25] *Id.* at 839–43.

to compel practicing lawyers to pay toward the costs of regulating their profession" without running afoul of the right to free association.[26]

Three decades later, *Keller* considered whether a bar's use of mandatory dues to fund its political activity violates the right to free speech. The attorney in *Lathrop* had raised this issue, but the Court chose not to resolve it because the record in that case was ill suited to the task.[27] In finally addressing the issue, *Keller* held that the use of mandatory bar dues to regulate and improve the legal profession does not violate an attorney's speech rights.[28] However, *Keller* prohibited bars from using mandatory dues for activities that are not germane to regulating and improving the legal profession.[29] The Court explained that state bars could satisfy their First Amendment obligation toward mandatory dues by adopting procedures to prevent the use of objecting attorneys' dues for non-germane expenses.[30] It posited, but did not hold, that the constitutional minimum set of procedures in the union-fee context, set forth in *Chicago Teachers Union v. Hudson*, would likely be adequate in the bar-dues context as well.[31] *Hudson* requires "an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while

---

[26] *Crowe v. Or. State Bar*, 989 F.3d 714, 728 (9th Cir. 2021), *petition for cert. filed*, No. 20-1678 (June 2, 2021).

[27] *Lathrop*, 367 U.S. at 845–48.

[28] 496 U.S. at 14.

[29] *Id.*

[30] *Id.* at 17.

[31] *Id.*

No. 20-30086

such challenges are pending."[32] But again, the Court did not mandate that state bars implement *Hudson* procedures.[33]

In addition to their free speech claim, the attorneys in *Keller* raised a free association claim that was not controlled by *Lathrop*. Specifically, they argued "that they cannot be compelled to associate with an organization that engages in political or ideological activities beyond those for which mandatory financial support is justified under the principles of *Lathrop*."[34] In other words, they argued that mandatory membership in a state bar is unconstitutional if the bar engages in any activity that is not germane to regulating or improving the legal profession. The Court acknowledged that the "request for relief appear[ed] to implicate a much broader freedom of association claim than was at issue in *Lathrop*."[35] But the Court declined to address the claim because the lower courts had not considered it.[36] *Keller* therefore left open whether an attorney can be compelled to join a bar that engages in non-germane activity.[37]

---

[32] *Chi. Teachers Union v. Hudson*, 475 U.S. 292, 310 (1986).

[33] *Keller*, 496 U.S. at 17.

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] We join the Ninth and Tenth Circuits in reading *Lathrop* and *Keller* as leaving that question unresolved. *See Schell v. The Chief Justice & Justices of the Oklahoma Supreme Court*, No. 20-6044, slip op. at 27–28, ___ F.3d ___ (10th Cir. June 29, 2021); *Crowe*, 989 F.3d at 727–29. We address the merits of this question head-on in *McDonald* and conclude that the answer is "no." *McDonald*, slip op. at 16–19, ___ F.3d at ___.

Both *Lathrop* and *Keller* heavily relied on cases governing union membership and dues.[38] The Supreme Court has since either overruled those union cases or seriously called their reasoning into question.[39] As the parties agree, *Lathrop* and *Keller* remain controlling law.[40] Even so, we recognize their weakened foundations, which counsels against expanding their application as we consider various questions the two cases left open. With this background in mind, we now turn to Boudreaux's claims.

## IV

We first consider whether *Lathrop* and *Keller* foreclose Boudreaux's challenge to mandatory membership in LSBA. Then we consider whether the Tax Injunction Act precludes federal courts from exercising jurisdiction over his challenge to mandatory dues. Finally, we consider whether Boudreaux has standing to pursue his claim that LSBA does not employ adequate procedures to safeguard his dues.

## A

Boudreaux's first claim is that mandatory membership in LSBA violates the First Amendment. The district court dismissed this claim on the merits under Rule 12(b)(6) as foreclosed by *Lathrop* and *Keller*. Boudreaux contends that his claim presents the (previously) open free association

---

[38] *Lathrop*, 367 U.S. at 828, 842–43 (citing *Ry. Emps. Dep't v. Hanson*, 351 U.S. 225 (1956) and *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740 (1961)); *Keller*, 496 U.S. at 6, 9–11, 13 (citing *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977)).

[39] *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps.*, 138 S. Ct. 2448, 2478–80 (2018) (overruling *Abood* and questioning *Hanson* and *Street*).

[40] *Crowe*, 989 F.3d at 724–25; *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

question from *Keller* (which we closed today in this circuit with our concurrently issued opinion in *McDonald*).[41] We agree.

Boudreaux alleged that LSBA engages in legislative advocacy that is "inherently political and ideological." His complaint specifically identifies LSBA's resolutions urging a moratorium on executions, opposing civil immunities, and advocating changes to the high school civics curriculum. His complaint also notes LSBA's lobbying against reducing the amount-in-controversy threshold to request a civil jury trial in state law, against requiring judges to file financial statements, and against allowing school personnel to carry firearms in schools. With these allegations, Boudreaux plausibly pleads that LSBA's political and legislative activity goes beyond what's constitutionally permissible under *Lathrop*—that the activity is not justified by the state's interest in regulating and improving the legal profession. That's all that is required to present the free association claim that *Keller* left unresolved.

Discovery may bear out that LSBA does not actually engage in any non-germane activity.[42] But at this stage, we take Boudreaux's allegations as true and draw all reasonable inferences in his favor.[43] Under that standard, dismissing his freedom of association claim as foreclosed by *Keller* was error.

LSBA does not contest that Boudreaux pleaded the open question from *Keller*. Instead, it argues that Boudreaux lacks standing to pursue this claim because he did not plead a cognizable injury to his associational rights. Specifically, LSBA argues that Boudreaux has not alleged that it engages in any non-germane activity with which he disagrees. But Boudreaux alleged

---

[41] *McDonald*, slip op. at 16–19, ___ F.3d at ___.

[42] *See, e.g.*, *id.*, slip op. at 19–28, ___ F.3d at ___.

[43] *See Ashcroft*, 556 U.S. at 678.

that he "opposes the LSBA's use of any amount of his mandatory dues to fund any amount of political or ideological speech, regardless of its viewpoint" and that "he does not wish to fund the LSBA's political and ideological speech and other activities." Plainly, Boudreaux objects to all of LSBA's political activity. And, though Boudreaux characterizes the complained-of conduct as "political and ideological," rather than using *Keller*'s term "non-germane," pleading standards don't demand such precision in terminology or any magic words.[44] The inference is clear that Boudreaux considers all of the conduct he identified in his complaint to be non-germane. That is enough to confer standing.

## B

Boudreaux's second claim challenges LSBA's use of mandatory dues to fund non-germane political activities under *Keller*. The district court characterized the bar dues as a tax and dismissed this claim for lack of jurisdiction under the Tax Injunction Act. We disagree with that characterization.

Under the Tax Injunction Act, "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."[45] "Distinguishing a tax from a fee often is a difficult task."[46] A classic tax (1) "sustains the essential flow of revenue to the government," (2) "is imposed by a state or municipal legislature," and (3) "is designed to

---

[44] *See* FED. R. CIV. P. 8(a)(2), (d)(1), (e).

[45] 28 U.S.C. § 1341.

[46] *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1011 (5th Cir. 1998).

provide a benefit for the entire community."[47] On the other hand, a classic fee (1) "is linked to some regulatory scheme," (2) "is imposed by an agency upon those it regulates," and (3) "is designed to raise money to help defray an agency's regulatory expenses."[48] Most assessments fall somewhere on a "spectrum" between a classic tax and a classic fee.[49]

Whether an assessment is a tax for purposes of the Tax Injunction Act is a question of federal law.[50] The label that the state legislature uses is immaterial.[51] A state court's characterization may inform the inquiry, but it is not dispositive.[52] Here, the district court relied on the Louisiana Supreme Court's description of the mandatory dues as "merely a form of levying a license tax upon the right to practice law."[53] But the state court's description from a 1942 case is outweighed by other factors.

First, the dues are imposed by LSBA, not the legislature, which supports the characterization of the dues as a fee. In reaching the opposite conclusion, the district court emphasized that the state legislature directed the Louisiana Supreme Court to create LSBA and to impose mandatory dues on its members.[54] But this ignores the reality that LSBA, not the legislature,

---

[47] *Id.*

[48] *Id.*

[49] *Neinast v. Texas*, 217 F.3d 275, 278 (5th Cir. 2000) (citing *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of P.R.*, 967 F.2d 683 (1st Cir. 1992)).

[50] *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 500 n.13 (5th Cir. 2001).

[51] *Home Builders*, 143 F.3d at 1010 n. 10.

[52] *Lipscomb*, 269 F.3d at 500 n.13.

[53] *In re Mundy*, 11 So. 2d at 400.

[54] La. Rev. Stat. § 37:211; La. Act No. 54 of 1940 ("That the Supreme Court is hereby memorialized to exercise its inherent powers by providing for the organization and

No. 20-30086

administers and sets the dues.[55] And, as Boudreaux argues, "virtually *all* charges government bodies impose are authorized by *some* statutory authority." That the dues were authorized by the legislature thus means little; the question is whether the dues are "imposed" by the legislature.[56] A charge is more likely to be a tax when it is "directly set by the legislature."[57] LSBA's dues are not.

Second, the dues are imposed only on the attorneys LSBA regulates, not on the public at large. This is characteristic of a classic fee. [58]

Third, the dues are used to defray LSBA's regulatory costs, not to raise general revenue for the state of Louisiana. The district court recognized as much. It nonetheless treated the dues as a tax because LSBA's activities benefit the general public. The district court specifically pointed to LSBA's practice area "sections" designed to improve the quality of legal services, its mediation and arbitration service to resolve disputes between lawyers and clients, and its client assistance program for clients who are left without a remedy for their lawyers' wrongs. But those are only some of LSBA's activities. LSBA also administers the state's continuing legal education program, maintains a standing committee on the Rules of Professional

---

regulation of the Louisiana State Bar Association . . . and by providing a schedule of membership dues, the non-payment of which shall be ground for suspension . . . .").

[55] LSBA By-Laws art. I; LSBA Articles of Incorporation art. V; *see also id*. at art. XIV, § 6(b) ("Such annual fee shall include annual dues as determined in accordance with Article V of the Articles of Incorporation of the Louisiana State Bar Association and the disciplinary assessment fee as determined in accordance with Supreme Court Rule XIX.").

[56] *Home Builders*, 143 F.3d at 1011.

[57] *Henderson v. Stalder*, 407 F.3d 351, 357 (5th Cir. 2005).

[58] *See Neinast*, 217 F.3d at 278 ("The second factor, on whom the charge is imposed, suggests that the charge is a fee: the charge is imposed only on a narrow class of persons, disabled people wanting a placard, not the public at large.").

No. 20-30086

Conduct, and sponsors the Judges and Lawyers Assistance Program to aid members of the profession struggling with substance abuse and mental health, among other things. There is no doubt that members of the public who come into contact with the legal system benefit from LSBA's regulation and improvement of the profession. But LSBA's focus is the legal community; it was not "designed to provide a benefit for the entire community."[59] That a benefit inures to the public—mostly indirectly—from the LSBA's activities does not change that, nor does it transform the LSBA's dues into taxes.

Because all three factors show that the bar dues are a fee, not a tax, dismissal under the Tax Injunction Act was improper.

C

Boudreaux's third claim challenges LSBA's procedures for ensuring that his dues are not used for non-germane purposes. Specifically, he alleges that LSBA does not provide adequate notice of its expenditures under *Hudson* because it publicizes only its legislative advocacy, leaving attorneys unable to challenge other activities as non-germane. The district court dismissed this claim for lack of standing, concluding that Boudreaux failed to allege a concrete injury because he had not identified any bar expenditures that he would have challenged if he had been given proper notice. According to the district court, Boudreaux's allegation that "the LSBA *may* also engage in other activities, in addition to its legislative advocacy, that a member could challenge as not germane" was too speculative to establish standing.[60] We disagree with the characterization of Boudreaux's injury.

---

[59] *Home Builders*, 143 F.3d at 1011.

[60] Emphasis added; *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) ("To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally

No. 20-30086

As an initial matter, we have never addressed whether the Constitution requires state bars to implement *Hudson* procedures in their entirety or whether some lesser safeguards may suffice. We now hold that *Hudson* procedures are a constitutional prerequisite to a state bar's collection of mandatory dues. In so holding, we part ways with the Ninth Circuit's recent decision in *Crowe v. Oregon State Bar* that "nothing in *Keller* mandates a strict application of the *Hudson* procedures."[61] Like the partial dissent in *Crowe*, we are persuaded that *Hudson* is the constitutional floor.[62]

In the public-union sector, where *Hudson* originated, the Supreme Court recently expressed skepticism that *Hudson* notice is ever sufficient to protect a union member's First Amendment rights.[63] Based in part on that skepticism, the Court overruled its precedent authorizing public unions to collect mandatory dues from non-member employees for expenditures that are germane to collective bargaining.[64] Employees must now "affirmatively consent *before* any money is taken from them" by a public union.[65] The Court has not applied this opt-in requirement to state bars. State bars thus remain free under *Keller* to collect mandatory dues if they maintain adequate safeguards to prevent those dues from being expended on non-germane activity. In determining which safeguards are constitutionally adequate, we

---

protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

[61] 989 F.3d at 727.

[62] *See id.* at 734 (VanDyke, J., dissenting).

[63] *Janus*, 138 S. Ct. at 2482 ("[T]he *Hudson* notice in the present case and in others that have come before us do not begin to permit a nonmember to make such a determination.").

[64] *Id.* at 2478 (overruling *Abood*, 431 U.S. at 209).

[65] *Id.* at 2486 (emphasis added).

No. 20-30086

are mindful of the Supreme Court's protective holdings in the union context. Requiring anything less than *Hudson* procedures in the bar context would be inconsistent with the Supreme Court's protective trend.

The question remains whether Boudreaux needed to identify a non-germane expenditure to which he would have objected to establish standing on his *Hudson* claim. As we noted above, Boudreaux's complaint does list LSBA's alleged non-germane activities. However, Boudreaux never claims that he would have sought a refund of his dues, or otherwise protested, had he been given "an adequate explanation of the basis for the fee."[66]

No court seems to have considered whether a plaintiff must identify an expenditure to which he would have objected in order to challenge a mandatory bar's procedural safeguards. Lacking clear guidance on the standing issue, the district court turned to *Air Line Pilots Association v. Miller*.[67] The union in *Air Line Pilots* adopted an arbitration procedure to comply with *Hudson*'s second requirement, that union members have an opportunity to challenge an expenditure before an impartial decisionmaker.[68] The Supreme Court held that the union members did not need to arbitrate their challenges to the union's fees before filing suit in federal court.[69] The Court rejected the union's concern that allowing plaintiffs to bypass arbitration would be inefficient, admonishing that a plaintiff cannot "file a generally phrased complaint, then sit back and require the union to prove the 'germaneness' of its expenditures without a clue" as to which expenditures

---

[66] *Hudson*, 475 U.S. at 310.

[67] 523 U.S. 866 (1998).

[68] *Id.* at 869.

[69] *Id.* at 879–80.

the plaintiff opposed.[70] Rather, the Court explained, "[a]gency-fee challengers, like all other civil litigants, must make their objections known with the degree of specificity appropriate at each stage of litigation their case reaches: motion to dismiss; motion for summary judgment; pretrial conference."[71] The district court relied on that language to require Boudreaux to allege a non-germane expenditure to which he was opposed before he could challenge LSBA's procedures.

*Air Line Pilots* is inapposite. As noted, that case involved *Hudson*'s second requirement, the impartial decisionmaker. This case involves *Hudson*'s first requirement, that members receive notice of the basis for the fee or dues. More importantly, unlike Boudreaux, the union members in *Air Line Pilots* challenged the collection of a particular fee, alleging that the union "had overstated the percentage of its expenditures genuinely attributable to 'germane' activities."[72] The constitutionality of the union's procedures was not at issue. Indeed, the Court seemed to assume that the union's procedures were constitutionally adequate when it rejected the union's efficiency argument. After cautioning that a plaintiff would not be able to challenge expenditures in a "generally phrased complaint," the Court explained that because of the *Hudson* notice, "an objector can be expected to point to the expenditures or classes of expenditures he or she finds questionable."[73] It emphasized that "[t]he very purpose of *Hudson*'s notice requirement is to provide employees sufficient information to enable them to identify the

---

[70] *Id.* at 878.

[71] *Id.*

[72] *Id.* at 870.

[73] *Id.* at 878.

expenditures that, in their view, the union has improperly classified as germane."[74]

In this case, Boudreaux asserts that LSBA's *Hudson* notice is not fulfilling its purpose. The Constitution requires that bar members be able to challenge expenditures as non-germane, but Boudreaux alleges he is unable to do so because of LSBA's deficient notice process. His inability to identify non-germane expenditures *is* his injury, not the non-germane expenditures themselves. In that way, his claim differs from the union members' in *Air Line Pilots*. By alleging that LSBA does not regularly provide notice of its expenditures with sufficient specificity, Boudreaux has pleaded an injury-in-fact for the claim he is pursuing. Dismissing his claim for lack of standing was therefore error.

## V

We REVERSE the district court's judgment and REMAND this case for further proceedings.

---

[74] *Id.*